Joseph L. DONAHUE, Plaintiff-
Appellee,

v.

Patrick STAUNTON, Individually And
As Chicago Area Zone Director, et
al., Defendants-Appellants.

No. 71–1160.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 24, 1972.

Decided July 6, 1972.

Rehearing and Rehearing En Banc
Denied Sept. 15, 1972.

Certiorari Denied Feb. 26, 1973.
See 93 S.Ct. 1419.

William J. Scott, Atty. Gen., Perry L. Fuller, Chicago, Ill., for defendants-appellants.

Lester Asher, Marvin Gittler, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and SPRECHER, Circuit Judge.

HASTINGS, Senior Circuit Judge.

Joseph L. Donahue brought this action against the defendants Patrick Staunton, individually and as Chicago Area Zone Director of the Illinois Department of Mental Health; H. C. Piepenbrink, individually and as Manteno State Hospital Superintendent; and John F. Briggs, individually and as Director of the Illinois State Department of Mental Health, alleging that defendants had discharged plaintiff from his position as Chaplain at the Manteno State Hospital in abrogation of his right to freedom of speech guaranteed by the First and Fourteenth Amendments to the Federal Constitution. He sought relief pursuant to Title 42, U.S.C.A. § 1983. Jurisdiction was established pursuant to Title 28, U.S.C.A. § 1343.

This case was tried to the court without a jury. The court filed its findings of fact and ·entered conclusions of law favorable to plaintiff and rendered judgment against the defendants in the amount of $2,000 as punitive damages, with interest; out-of-pocket expenses in an amount to be later determined; attorney fees of $750; and costs. Affirmatively, defendants were ordered to offer plaintiff full and unconditional reinstatement to his former position and, in the event he accepted such reinstatement, an injunction would be issued restraining and enjoining defendants, their agents and successors, from interfering with, coercing or discriminating against plaintiff in the exercise of his protected rights of free speech. Defendants have appealed.

Plaintiff Father Donahue, a Roman Catholic Priest, was appointed Catholic Chaplain at Manteno State Hospital on July 14, 1964, and served in such capacity until his discharge on December 4, 1969. As Chaplain, plaintiff received a salary which he, under his vow of poverty, forwarded to the Order of St. Viator, withholding sufficient funds to provide for his daily needs. In this capacity plaintiff was charged with serving the spiritual needs of the patients and employees at Manteno, along with sundry other duties, including speaking at public functions to explain the operations of the hospital.

Along with all other employees of the hospital, plaintiff was annually rated in the performance of his duties. Until the final report, prepared after plaintiff's discharge, he was always rated either "good" or "excellent" on seven separate categories of duties and responsibilities. The annual review covering the period from July 14, 1968 to July 14, 1969 (five months prior to his discharge), prepared by plaintiff's immediate superior, contains the following analysis of his performance:

"Father Donahue energetically and conscientiously discharges his duties as a spiritual advisor and counselor to the patients of Catholic faith at M. S. H. He has extremely favorable rapport with the patients to whom he provides the chaplaincy services, and at all times considers what is best for the patient.

\* \* \* \* \* \* \*

"Father Donahue constantly strives to bring about better conditions at M. S. H. and in doing so apprises the staff of changes that should be initiated in order to correct situations which are not acceptable for the care and treatment of the mentally ill. His ability to communicate with others concerning these problems and the presentation of his solutions leave little to misinterpretation. His strong initiative and precise communicating among employees and patients are attributes which make him an asset to M. S. H."

Soon after plaintiff was assigned to Manteno, the hospital entered a period of transition. New policies were instituted so that the patients were no longer kept locked up and under strict security, no longer were the sexes separated, and the hospital's employment practices were decentralized. Plaintiff approved of these enlightened and progressive policies in theory but became alarmed with the method of their implementation. It was the consensus that such new pro-

grams would require more supervision than formerly provided. He was gravely concerned that the supervision was inadequate.

In 1966 plaintiff expressed his criticism and concern in a union newspaper column which he authored; in a public speech to a convention of the Illinois State Federation of Labor; and in other avenues of public expression.[1] Following the Board's report, *supra* note 1, defendant Piepenbrink in 1967 appointed plaintiff to a committee with the responsibility of developing a hospital policy relating to the problems of promiscuity.

It appears from the record that there was a lull in the plaintiff's public criticism of the hospital operations. Later, frustrated by what he felt was a lack of progress in resolving the problems of the hospital, plaintiff in the fall of 1969 began another campaign of public criticism. His public statements included a speech by him critical of the operations of the hospital, which was reported in a local newspaper on October 20, 1969; on October 27, 1969, the same newspaper printed a letter to the editor written by plaintiff in which he criticized as impractical a particular program of the hospital; and on November 13, 1969, the same newspaper published a paid advertisement authored by plaintiff and one Thomas Nayder which set forth 12 specific incidents of negligence or improper activity at the hospital.

The advertisement appears to be the most critical statement made by the plaintiff and one of the significant factors leading to his discharge. In relevant part, the advertisement charged that the Director of the Illinois Mental Health Department, the Superintendent of Manteno State Hospital and the directors of certain programs at the hospital were all "laymen," and that there was neglect in the preparation and funerals of the dead, little or no effort on the part of authorities to prevent runaways and improper treatment and delay in treatment of patients. He questioned the legality of a self-medication program and asserted that the hospital lacked certain facilities. He charged there was mixing of untidy patients with tidy patients, that the hospital issued birth control pills to highly promiscuous patients and other incidents of neglect.

Although the truth or falsity of these allegations was not proven at trial, we note that many of the accusations came from reports of the "Pharmacy & Therapeutics Committee Meetings" at Manteno State Hospital and other inter-office memoranda. Also, plaintiff testified, and we presume from the court's findings that it was credited, that he checked every charge he made either by direct observation, conversation with

1. On September 9, 1966, the Governor of Illinois called for an investigation by the Board of Mental Health Commissioners into the public criticism of the Manteno State Hospital. The main impetus for this investigation seems to have come from picketing by off-duty hospital employees who publicly expressed concern over the moral climate at the hospital.

The Board issued a report to the Governor on October 20, 1966, and found that sexual behavior of all types would undoubtedly be less if there was a more adequate staff to supervise the patients under the more permissive policies. However, the Board felt that sexual morality was not the basic issue but rather that Manteno was in transition and operating a gigantic institution on a skimpy budget which was designed before most of the new programs began.

This report in many respects is consistent with the concerns expressed by plaintiff in his public statements, although the report was critical of public criticism itself. In the newspaper report of plaintiff's public speech it was stated:

"The new programs introduced by the Illinois Department of Mental Health are fine but it's like buying an expensive car when you can only afford a wheelbarrow. The programs need workers and the patients need constant examination, weeks and weeks of intensive treatment and constant care.

"But he added, because there are insufficient employes and because 'many employes are unqualified' to carry out such programs, the result has been unsupervised wards, inadequate care, and illicit sexual activity."

"reliable sources, doctors, nurses, security men and aides," or through a number of memoranda which came to his office. He also testified that he never knowingly published or stated anything that was false.

Letters were also written by plaintiff to the Governor in which he stated his purpose was "to relate some of [the] happenings" at the hospital. Copies of such letters were sent to defendant Briggs. In addition, plaintiff encouraged others to write to the Governor to protest what he believed to be the deplorable conditions at Manteno.

Defendants assert that the plaintiff's statements were made without checking their validity and contained falsehoods and half-truths which were detrimental to the operation of the hospital and the well-being of the patients. The termination slip handed to plaintiff stated he was discharged for cause, to wit:

"In the best interest of the patients and staff at Manteno Hospital, the Chicago Area Zone Director, Patrick Staunton, M. D., and Manteno State Hospital Superintendent H. C. Piepenbrink, have decided on this action. This priest has consistently, and without checking validity of criticism, made public charges against the treatment programs of this facility which have little basis in fact and which are detrimental to the care and treatment of the patients and can no longer be tolerated by the management of one of its employees."[2]

Hence the principal issue we face here is whether the discharge of plaintiff by the named defendants violated his First Amendment right to freedom of speech. Ancillary issues are: whether plaintiff was an employee of the Manteno State Hospital; whether the Illinois statutory scheme for the discharge of employees was improperly held unconstitutional;

and whether the remedy afforded was proper.

We will assume for the purposes of this opinion that some of the allegations made by the plaintiff were false or misleading. However, upon our examination of the record, we find that at the time of their issuance they were reasonably believed to be true by the plaintiff and were not knowingly false and recklessly made.

█ Defendants' first claim, that plaintiff was not an employee of the State of Illinois or Manteno State Hospital, is without substance. It almost goes without saying that plaintiff was an employee of the State, *i.e.*, he received a salary from the State, it being irrelevant that he saw fit to forward the money to his Order; his performance as Chaplain was evaluated annually by his superior, as was the performance of all other hospital employees; and his termination slip spoke of him as an employee. We hold there were sufficient indicia of an employment relationship to support this cause of action.

Since we find that plaintiff was an employee of the State, we need not decide the further question of whether any relationship between an individual and the State other than employment, which, if terminated in violation of constitutional rights, would be sufficient for a cause of action under section 1983.

Defendants next contend that the "Personnel Code" of Illinois, established pursuant to ch. 127, § 63b101, et seq., of Illinois Rev.Stat. (1969), was implicitly held unconstitutional by the trial court and thus the use thereof was enjoined. This they argue violated Title 28, U.S. C.A. § 2281, which provides that any injunction restraining the enforcement or use of a state law by a federal court must be by a district court of three judges.

---

2. There is credible evidence, in the form of a memorandum from John P. Dailey, Special Assistant to the Governor, to defendant Briggs approving his decision to discharge plaintiff and cautioning him to do

it properly because of the inevitable protest from certain sectors, to support the court's conclusion that defendant Briggs was also a party to the discharge of plaintiff.

It is conceded that plaintiff's position with the hospital was "exempt" under the Illinois "Personnel Code," *supra*, and that he could be discharged at his employer's discretion without a civil service hearing.

■ We hold that the court below did not find the Illinois statutory scheme violative of the First and Fourteenth Amendments, but rather held that the discretion afforded employers by the statute was necessarily limited by the requirements of the Federal Constitution; hence, by implication the state statute was held constitutional. The defendants, not the statute, were held to have deprived plaintiff of his constitutional rights. The conditional injunction was directed against the defendants, state agents, and not the use of the state statute.[3] It necessarily follows that we find nothing improper in the district court's procedural disposition of this case.

We finally come to the crucial issue, *viz.*, whether the defendants by discharging plaintiff deprived him of his First and Fourteenth Amendments rights to freedom of speech.

Defendants would have us rely on the analysis in Jenson v. Olson, 8 Cir., 353 F.2d 825 (1965), in deciding this question. We find *Jenson* to be unpersuasive, mainly because it no longer represents the prevailing thought in this area. *See* Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) and Pickering v. Board of Education, etc., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The leading Supreme Court case involving constitutional rights of public employees is Pickering v. Board of Education etc., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Under the particular facts in that case, the Court, applying the New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), standard for defamation against public officials, held: "In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." 391 U.S., at 574, 88 S.Ct., at 1738.

■ *Pickering* was a refinement of the idea that public employment may not be conditioned upon the surrender of constitutional rights. As was stated by the Court in Keyishian v. Board of Regents, 385 U.S. 589, at 605–606, 87 S.Ct. 675, at 685, 17 L.Ed.2d 629 (1967), " ' * * * the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' " Taking this lead, we announced in Muller v. Conlisk, 7 Cir., 429 F.2d 901, at 904 (1970): "It may no longer be seriously asserted that public employees, including policemen, have no right to criticize their employer."

The reason for the rule announced in *Pickering* was explained in Kiiskila v. Nichols, 7 Cir., 433 F.2d 745, at 749 (1970). "A citizen's right to engage in protected expression or debate is substantially unaffected by the fact that he is also an employee of the government and, as a general rule, he cannot be deprived of his employment merely because he exercises those rights. This is so because dismissal from government employment, like criminal sanctions or damages, may inhibit the propensity of a citizen to exercise his right to freedom of speech and association." The court elaborated: "To protect society's interest in uninhibited and robust debate the first amendment demands that government be prohibited from inhibiting or suppressing speech by indirection

---

**3.** The district court specifically stated: "I have no quarrel with your [defendants'] right to discharge noncivil service employees peremptorily providing that their federal civil rights and constitutional rights have not been violated. I have no quarrel with that being the law."

through discharge of a government employee when the same objective could not constitutionally be achieved by criminal sanctions or other direct means." *Id.*

This is not to say that a public employer or State may under no circumstances discharge an employee for his public statements. *Pickering* provided, 391 U.S. at 569, 88 S.Ct. at 1735: "Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged." Rather the Court felt: "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734.

■ Interests of the State which, if strong enough, the Court in *Pickering* felt might lead to a different result in the future are: (1) maintaining discipline or harmony among co-workers; (2) need for confidentiality; (3) employee's position may be such that his false accusations may be hard to counter because of the employee's presumed greater access to the real facts; (4) statements which impede the employee's proper performance of his daily duties; (5) statements so without foundation as to call into question his competency to perform the job; and (6) a close and personal working relationship between the employee and supervisor which called for personal loyalty and confidence.

■ Defendants argue that plaintiff's accusations were so extensive and so critical that they impeded the performance of his duties, namely, to address "professional and lay groups to promote understanding of problems and obligations concerning patients" and "interpret the institution's problems and policies to the public." However, we do not find that this was such a critical responsibility of a Chaplain as to give the State a strong enough interest to interfere with the plaintiff's free speech rights. This is especially so since plaintiff was not even evaluated on this function until May 13, 1969, and then he was rated "good." Further, defendants were not able to prove that the plaintiff's vociferousness hindered him in the performance of his religious and spiritual duties toward the patients at Manteno.

It could be argued that plaintiff's exaggerated comments, because he is a priest, were given greater credence by the general public than would those of a non-clerical employee. This may be true, but defendants have not shown that they were hindered in any way in responding to the accusations of plaintiff; in fact, at several points they specifically chose not to respond. Also, if plaintiff's criticisms were so clearly false, as defendants would have us believe, we do not see how his being a priest, were given greater credence by being refuted by open and free public debate and discussion. Indeed, that is what freedom of speech is all about.

■ In sum, we have considered the countervailing factors mentioned in *Pickering* and find them inapplicable here. We conclude and hold in the case at bar that the interest of society in "uninhibited and robust debate" on matters of public concern, such as mental health care, and plaintiff's individual interest in being free to speak out on matters of concern to him, outweigh those of the State as an employer. This is a proper guarantee of "the public's right to know." It follows that the actions of defendants, as agents of the State, in dismissing plaintiff, violated his First and Fourteenth Amendments rights to free speech.

■ Having found that defendants violated plaintiff's constitutional rights,

our next concern is whether the relief afforded in the judgment below was proper. Defendants first argue that because the district court found that they "were acting within their authority and capacity as officials and agents of the State of Illinois," they were entitled to an immunity from any and all damages resulting from their actions.

In McLaughlin v. Tilendis, 7 Cir., 398 F.2d 287 (1968), where the defendant had claimed protection from damages in a section 1983 action under the Illinois Tort Immunity Act (Ill.Rev.Stats.1967, ch. 85, § 2–201), we held: "Under the Supremacy Clause, that statute cannot protect defendants against a cause of action grounded, as here, on a federal statute. * * * However, other officials [than legislators and judges], such as present defendants, retain only a qualified immunity, dependent on good faith action." *Id.* at 290.

In this regard, defendants claim that since the court below did not specifically find that they acted in bad faith, they are entitled to immunity from all damages. However, it is a necessary implication of the court's decision and judgment against the defendants that they acted without justification in the case at bar. "At best, defendants' qualified immunity in this case means that they can prevail only if they show that plaintiffs were discharged on justifiable grounds. Thus, here a successful defense on the merits merges with a successful defense under the qualified immunity doctrine." *McLaughlin* at 290–291.[4]

■ Defendants claim that the damage award of $2,750 ($2,000 punitive damages and $750 attorney fees) was improper because it was against defendants *and/or their successors*. This is inaccurate and ignores the fact that the district court by order of January 7, 1971, deleted the words "and/or their successors" from the monetary award for punitive damages and attorney fees. However, we find that the award of out-of-pocket expenses inadvertently still includes the words "and/or their successors." Since defendants' successors were not parties to this law suit, the judgment to that extent must be and is ordered modified by deleting the words "and/or their successors" from the award of out-of-pocket expenses.

■ Defendants question the award of *punitive* damages. Their concern is without foundation. Since we have found that defendants acted in bad faith, the award of punitive damages was within the sound discretion of the trial court.

Although the defendants have not raised the question, we feel that, in the interest of justice, we should inquire into the propriety of awarding attorney fees in this case. Section 1983 does not by its terms expressly authorize or deny the allowance of attorney fees. "There is ample authority * * * to support the proposition that the allowance of attorneys' fees and expenses of preparation for trial is in the discretion of the district court *sitting in equity* where exceptional circumstances call for their allowance in order to do justice between the parties * * * ." Lee v. Southern Home Sites Corporation, 5 Cir., 429 F.2d 290, at 295 (1970).

In *Lee*, where the trial court had denied attorney fees, the court found, at 296: "Clearly, for this court to overturn a denial of attorneys' fees, it must appear that the trial court abused its discretion, but it is impossible to review the soundness of such an exercise of discretion unless the trial court indicates in its findings of fact the grounds upon which it exercised its discretion * * * ." Similarly, in the case at bar, there are no grounds given for the

---

4. *See also* Simcox v. Board of Ed. of Lockport Tp., etc., Will County, Ill., 7 Cir., 443 F.2d 40, at 42 (1971), where we reiterated the established rule: "Any immunity which public officials enjoy in dealing with their employees is limited by the requirement that their actions *vis-à-vis* such employees be taken in good faith."

award of attorney fees by which we can judge the soundness of the exercise of the trial court's discretion.

 Nevertheless, we need not remand for further findings in this case because the reasons for the award of attorney fees appear from the face of the record. The benefit to the general public, *i. e.*, of encouraging free and robust public discussion, is substantial in this case and should not depend for its protection upon the financial status of the individual who is deprived of his constitutional rights. Hence, the relative financial positions of the parties at the time of the constitutional violation, which in the case at bar weighs in favor of allowing attorney fees,[5] is relevant. There is also some evidence that the result of plaintiff's dismissal had a chilling effect upon public discussion of mental health care by employees at Manteno. And finally, although defendants' actions were not found to be egregious, they were consciously taken to stifle plaintiff's public criticism. Although we consider the better practice to be for a trial judge to state his grounds for an award of attorney fees, we hold the evidence weighs in favor of an award here and in doing so that the district court did not abuse its discretion.

 ██ We have reviewed all other objections to the relief afforded in this case and find them unpersuasive. If more should be said, we need only to quote from the oft-cited case of Bell v. Hood, 327 U.S. 678, at 684, 66 S.Ct. 773, at 777, 90 L.Ed. 939 (1946). "Moreover, where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use

any available remedy to make good the wrong done."

For the foregoing reasons, the judgment is affirmed as modified.

Affirmed as modified.

SWYGERT, Chief Judge (dissenting).

Despite the defendants' arguments, I agree with the court that the plaintiff's connection with the Manteno State Hospital was tantamount to an employment relationship. Thus, as indicated by Judge Hastings, the crucial question is whether the plaintiff's constitutional right of freedom of speech was infringed by reason of his termination as chaplain of the hospital. In my judgment the circumstances leading to plaintiff's discharge legally justified that action and therefore it was error to afford relief under 42 U.S.C. § 1983.

The premise that public employment may be conditioned upon a surrender of constitutional rights was flatly rejected in Keyishian v. Board of Regents, 385 U.S. 589, 605–606, 87 S.Ct. 675, 17 L. Ed.2d 629 (1966); however, the first amendment rights of public employees are not absolute and must yield to accommodation when overriding interests of public policy are at stake. United Public Workers v. Mitchell, 330 U.S. 75, 95, 67 S.Ct. 556, 91 L.Ed. 754 (1946). The court concedes as much when it acknowledges that there can be circumstances when a public employee may be discharged for his utterances.

Pickering v. Board of Education etc., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), does not wipe out all curtailment of a public employee's right to speak. "[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. at 568, 88 S.Ct. at 1734.

---

5. Although there is some indication in the record that plaintiff is on leave from his Order as a priest and is working for compensation with a labor organization, this is irrelevant since the critical time is the time of the constitutional deprivation.

The Court went on to explain that a balance of competing interests must be struck. "The problem in any case is to arrive at a balance between the interests of the . . . [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734.

I read *Pickering* to hold that if the functions of a public entity are substantially impeded by an employee's statements relating to those functions, measures may be taken to regulate such speech even to the point of terminating employment. If that reading is correct, then the following view expressed by the Eighth Circuit in Jenson v. Olson, 353 F.2d 825 (8th Cir. 1965), even though predating *Pickering*, has continuing vitality: "When his . . . [the employee's] speech is disruptive of the proper functioning of the public's business the privilege of governmental employment may be withdrawn without it being said that he was denied his freedom of speech. To hold otherwise would enable governmental employees to practice the rankest form of insubordination and safely hide behind the right of free speech."

As shown by the majority opinion the plaintiff initially began criticizing the hospital's operation in 1966. Because of plaintiff's and others criticism, the then Governor of the State of Illinois requested the Board of Mental Health Commissioners to investigate charges of immorality at the Manteno State Hospital. Five Illinois citizens, including two members of the Chicago Bar, composed the Board. After conducting several days of hearings and interviewing nearly thirty witnesses, the Board issued a lengthy report which included a number of findings and a variety of recommendations.

The report pointed out that the hospital housed over six thousand patients and had in excess of eighteen hundred employees. The Board then referred to the fact that, in line with modern mental health concepts, the old custodial approach "which resulted in the bitterly criticized warehousing of our mentally ill" was being replaced by newer methods so as to permit the institution to be administered as an "open institution." It was acknowledged that this change had generated a number of administrative problems. The Board then addressed itself to the specific accusation of immorality within the institution. The substance of the report is that the hospital had been doing all it could do to curb "acting-out" sexual behavior among the patients, given the fact that there was a lack of adequate security and supervisory personnel. The Board specifically found the charge untrue that birth control pills were being purchased and indiscriminately dispensed. It concluded that sexual immorality was not the basic problem and that many of the other problems besetting the hospital were due to the changes then in progress as well as a "skimpy" budget and a "burgeoning" admission load. Among other recommendations, the Board urged that the "open door" policy continue.

In the course of its discussion, the Board stressed the fact that the promulgation of exaggerated and in some instances unfounded accusations were harmful to patients and their families and discouraged administrators "who are trying their best to bring about changes against considerable odds." Regarding these accusations, the Board observed, "Estimates are that it will take a year to repair the damage done to the patients and their relatives, and to restore their pride and that of the employees." The Board added, "These remarks are not a plea to stifle criticism —in a community of 8,000 people related to a giant mental health institution as patient, employee or executive, there will always be a broad range of matters to criticize. . . . It is always a satisfying demonstration of public conscience when there is discussion and concern

about programs. But this is only true when responsible and valid criticism with supporting facts is so directed in such a way as to be constructive and to preserve the goals of the institution."

The Board's report was issued in October 1966. Following its issuance, the plaintiff ceased critizing the hospital for approximately three years; however, in the latter part of 1969 he resumed his attacks. As the majority opinion indicates, these attacks took the form of a speech reported in the *Kankakee Daily Journal*, a letter to the editor printed in the same newspaper, an appearance on a television program, and an advertisement prepared and paid for by the plaintiff which appeared in the *Journal*.

Most of the accusations leveled at the hospital's administration were nothing short of sensational. The newspaper account of his speech reported the plaintiff as having said that "homicidals, suicidals, arsonists and molesters were being released into the streets of Kankakee, Bradley, Manteno" and other communities; also that because of unqualified employees there were "unsupervised wards, inadequate care, and illicit sexual activity." During the television program the plaintiff charged that many of the patients had died of dehydration because they could not get to a drinking fountain. The most scathing criticism was contained in the advertisement which the plaintiff authored.[1]

1. The advertisement appearing in the *Kankakee Daily Journal* reads in part:

SOME FACTS TO HELP YOU
FORM A JUDGMENT:

1. The piling of bodies (male upon females) upon one another in the Morgue Vaults.

2. Neglect of Morgue refrigeration, causing decay of bodies before Burial: Recently a couple travelled over 60 miles to attend Morgue Funeral of a relative, were unable to view deceased. Undertaker was unable to properly embalm the decomposed body.

3. Little, or no effort on part of authorities to prevent runaways: Some runaways have died in nearby fields, where their bodies were torn apart and eaten by the birds and animals of the fields. (It would be humane if they were dead before the beasts came upon them.)

4. One Patient complained she was ill. Suddenly she was violently ill and moved to the Acute Hospital where she died one hour later. Perforated ulcerated colon, peritonitis had had set in. Proper examination of patient in the Acute Hospital on first complaint may have saved her life. Mother of this patient was not notified of the girl's illness. She became very disturbed and upset when notified of her daughter's death.

5. January 1969 a Patient was found to have a Cancer of the Nasal cavity. In March 1969 a biopsy was performed. The Patient was ordered to be sent to the Illinois Eye and Ear Infirmary, Chicago, a tranfer that was not made until late August, 1969. Why the delay?

The Doctor at the Infirmary complained of the terrible manner that Manteno State Hospital neglected its patients. (Great loss of weight, difficulty in swallowing, dehydration, and so weak he could not stand.)

6. Self Medication program, where Patients are given the responsibility to take their own medication. No Nurses or certified Aides on the program. (The legality of such a program is questionable.)

7. A Patient struck in face by another patient bled profusely. Unable to stop flow because Mantento State Hospital lacked the facilities. Time was a factor. Patient was moved to a Hospital 50 miles away where he died. In such an emergency the question is "why the facilities of the local Hospitals were not used?"

8. Many patients are untidy because of organic reasons. Frequently they are placed on Wards with tidy patients. Some Physicians believe these organic conditions are most infectious. Visitors (of all ages) to these Wards are often exposed to Male and Female patients sitting around naked slopping in their feces.

9. Birth control Pills issued, as admitted by member of the Hospital pharmacy committee, only to prevent pregnancies of highly promiscuous patients.

10. Aides on Wards where young male and female patients reside complained to the Authorities "male patients abuse the female ones." "Wards are not safe for patients or employees." What must we do when female patients ask help

Shortly after the appearance of the advertisement the hospital terminated the plaintiff's employment. The termination notice contained the reason given by the hospital for its action: "For cause, to wit: In the best interest of the patients and staff at Manteno State Hospital, the Chicago Area Zone Director, Patrick Staunton, M.D., and Manteno State Hospital Superintendent, H. C. Piepenbrink, have decided on this action. This priest has consistently, and without checking validity of criticism, made public charges against the treatment programs of this facility which have little basis in fact and which are detrimental to the care and treatment of the patients and can no longer be tolerated by the management of one of its employees." This reason, namely, that plaintiff's accusations had a detrimental effect on the hospital's programs for the treatment and care of its patients is corroborated by two contemporaneous documents: one, a report made by the head of the Mental Health Department,[2] the other, a memorandum signed by the director of the hospital's Administrative Services.[3]

Although the state has the burden of demonstrating that its governmental functions have been impaired by the public utterances of an employee, that burden was met in this case. It is not difficult to envision the harmful and disruptive effect that plaintiff's accusations had on the patients and their families, the hospital employees and the operation of the hospital generally. His earlier criticism in 1966, the resulting investigation, and the report of the Board of Commissioners must be considered in assessing the position taken by the hospital in 1969. The belief entertained by the institution's authorities that the health and well-being of the patients had been endangered was reasonable under the circumstances. Significantly, the plaintiff offered no evidence to refute the conclusions stated in the termination notice.

Moreover, the hospital's conclusion that the plaintiff had been irresponsible in voicing his criticisms is substantiated by the plaintiff's testimony at trial. The heading of the advertisement contained the statement, "Missing; Psychiatrists and Licensed Physicians; who should know what is best for Mentally Ill." On cross-examination the plaintiff admitted that there "may have been a few" psychiatrists and licensed physicians at the hospital. In reference to his charge that many patients had died of dehydration because they were unable to get to a drinking fountain, the plaintiff admitted that during his employment he received hospital records in regard to "various deaths and so-called causes," and that none of the reports indicated that dehydration had been caused in the manner he had stated during the television broadcast. As a further indication of plaintiff's irresponsibility in making his accusations, a *Kankakee Daily Journal* reporter accompanied the plaintiff prior to his dismissal on an inspection tour of wards at Manteno. The newspaper later carried a story that its reporter could find no evidence of the conditions the plaintiff had described.

The task of balancing the conflicting interests outlined in Pickering v. Board of Education etc. is admittedly a difficult one. It requires a careful examination of every facet of the situation in question lest a vital constitutional right be inadequately protected. Such an examination of the facts in this case persuades me that the disruptive effects of plaintiff's actions on the proper func-

---

because male patients bother them? The Doctor replied: "Tell the men to leave the women alone."

11. A known hostile, aggressive and frequent runaway patient has twice in four months stole sets of Hospital keys and car keys from careless employees and stole two automobiles.

12. Some Mittimus cases have privilege of the Hospital grounds. One was permitted a Home Visit. (ILLEGAL?)

2. See Appendix I of this dissent.

3. See Appendix II of this dissent.

tioning of the Manteno State Hospital which lead to his dismissal were substantial and that the interests of the state outweighed the right of the plaintiff to speak as he did. I would hold that defendants had justifiable reasons for terminating the plaintiff's employment and that there was no violation of a constitutional right.

## APPENDIX I TO OPINION OF SWYGERT, CHIEF JUDGE, DISSENTING

Manteno State Hospital
Department of Mental Health

### REPORT OF SEPARATION

Name of Employee Joseph Donahue in the Program Support-Chaplaincy (Department or Program)

Nature of the Departure Termination (Resignation, Leave of Absence, Transfer, Termination, Discharge, Prob. Discharge, Susp.)

Character of Service Poor (Excellent, Good, Fair, Poor)

Final Date Employee Worked December 2, 1969

Final Date Employee is to be Paid Entitled to 3 vacation and 22 accumulated days as of December 16, 1969

/s/ E. C. Simmons,
(Signature of Department Head)
CPH
(Timekeepers Name)

14. Since the last rating, Father Donahue assumed an opposite position of that of the Department, and in so doing, endeavored to force his opinions and views above that of the Department and after repeated consultations with his Supervisor, the Superintendent and Zone Director, he was unable to support the Department; as a result he was terminated. He was unable to accept the policies established by the Department of Mental Health, and the end result was that he could not interpret them but instead rebutted them, which made him incompatable as a loyal employee of the Department of Mental Health. The position that he assumed in relationship to that of the Department consumed a great deal of his time and as a result, he was unable to complete the work and duties which normally are functions of the Catholic Chaplain. His opposition was so strong that he had difficulty in cooperating with other faiths, even to the extent of being able to maintain rapport between himself and his assistant.

18. Father Donahue's initiative in carrying out the duties of the Catholic Chaplains' Office and his dependability in working with the Hospital and its Programs were in exact opposition. Little support, if any, was granted by him, but an undue amount of criticism and opposition were used in an attempt to defeat the policies which were believed to be in the best interests of the residents. His judgment in relation to the Programs at the Hospital and the position which he occupied, left a great deal to be desired and his ability to communicate instructions almost became nonexistent. His inability to work with and cooperate with his assistant were indicative of his inability to adequately supervise and develope his subordinates.

## APPENDIX II TO OPINION OF SWYGERT, CHIEF JUDGE, DISSENTING

11–3–69 cc: Dr. Staunton
Manteno State Hospital

### MEMO

Date November 3, 1969
In Re: ............
To Mr. Piepenbrink, Superintendent
From Mr. Wagner—Geriatric Program

Discussions with several Geriatric Program employees have made me aware

that some individuals in the community who might consider employment at the hospital are hesitating to do so due to Father Donahue's recent "alarming" statements. At a time when the labor market is tight and finding suitable replacements is extremely difficult, it is indeed confusing that Father Donahue would undertake a vilification of the hospital on matters that have already been proven to be either exaggerations or falsehoods. Cannot someone assist Father Donahue in redefining his complaints so that they can be stated more constructively? Alarming potential employees will not assist the hospital in meeting current challenges and providing the best possible care to our patients.

RAW:mbp

cc: Mr. Steinmetz
Mr. Simmons

 Signature /s/ Robert A. Wagner,
 *Robert A. Wagner,*
 *Director Administrative Services.*