The foregoing memorandum constitutes our findings of fact and conclusions of law.

Captain Haywood LUSK, Plaintiff,

v.

Nolan ESTES, Individually and in his Official capacity as Superintendent of the Dallas Independent School District, Dallas County, Texas, et al., Defendants.

Civ. A. No. 3-4164.

United States District Court,
N. D. Texas,
Dallas Division.

July 3, 1973.

Larry Watts, Houston, Tex., for plaintiff.

Warren Whitham, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

ROBERT M. HILL, District Judge.

Captain Haywood Lusk has filed this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging that the Dallas Independent School District's refusal to renew his contract of employment as a teacher violated his rights under the First and Fourteenth Amendments of the United States Constitution. The defendants in this action are the Dallas Independent School District (hereinafter referred to as "DISD"), Dr. Nolan Estes, the school superintendent, and those members of the Board of Trustees of the DISD who voted in favor of nonrenewal of Lusk's contract.[1]

---

1. These defendants are: Mrs. Henri L. Bromberg, Jr., Dr. Emmett J. Conrad, Sam R. Faris, Daniel W. Foster, Trinidad Garza, and G. R. Hollingsworth.

Lusk complains that the nonrenewal of his teaching contract was unconstitutional for two reasons. First, Lusk alleges that he was denied procedural due process at the hearing held by the Board of Trustees reviewing the school administration's refusal to renew his contract. Second, Lusk complains that the nonrenewal of his employment contract was a direct result of his public appearances before the Dallas City Council and the Board of Trustees of the DISD and violated his First Amendment rights. Lusk seeks back pay from the end of the 1969–70 school year to date and reinstatement to his former position as a high school Reserve Officer Training Corps (hereinafter "ROTC") Commandant. This court is of the opinion that Lusk's complaint of a denial of procedural due process lacks merit but that his First Amendment complaint is meritorious and that the relief he seeks should be granted.

## I. THE FACTS

### A. Before February, 1970

Lusk, a retired United States Army Officer, was first employed by the DISD as a ROTC Commandant for Booker T. Washington High School during the 1967–68 school year. After receiving a "good" rating as a teacher from the principal at that school, Lusk was reemployed for the 1968–69 school year and was transfered to L. G. Pinkston High School. Pinkston is located in a low income area with predominantly Black and Mexican-American students and in order to promote the racial integration program of the DISD, Lusk volunteered to be one of the first Caucasian instructors to serve on the faculty at Pinkston.

In September of 1968 Lusk began to voice his concern for certain community and economic problems affecting students and teachers in the DISD in general and at Pinkston High School in particular. On September 15, 1968, he wrote a lengthy letter to Dr. Estes, the superintendent of schools, concerning the need for a more integrated faculty,[2] enforcement of the truancy laws[3] and special remedial programs in economically deprived areas,[4] and discussing the fact that crime and violence existed in the schools.[5] In a reply letter Dr. Estes thanked Lusk for his comments and as-

---

2. "SCHOOL FACULTIES: Should be more fully integrated with a greater mixture of races, colors and creeds. Last year, there were two white people in my school—myself and the vice principal. This year, at another school, there are 5 white teachers out of about 50."

3. "SCHOOL ATTENDANCE: Truancy laws must be enforced. Children should not be kept home to baby-sit nor should they be allowed to play hookey in order to work. We need a law that would require both the parent and the child to be responsible. I understand Denver, Colorado has an excellent law."

4. "REMEDIAL PROGRAMS: A vast array of remedial programs are needed to salvage students still in school. They are as follows:
   a. *Educational*: Most deprived children need remedial instruction in reading, composition, and speech.
   b. *Health*: Far too many children in school need proper glasses, dental and health needs provided for. You can't teach a child to read if he can't see the words.
   c. *Environmental*: Too many children are living in homes which can not meet the minimum standards prescribed by city codes. Nothing is done to condemn these hovels and pig stys. Adequate housing, of some sort must be provided by the community.
   d. *Social*: Children must learn respect for authority; must learn to obey; must learn that life is not permissive; must learn to respect property; must learn to be responsible. Parents must be taught that they are jointly responsible for the actions of their children both at home and away from home."

5. "UNDESIRABLE CHARACTERS AROUND SCHOOLS: Schools should be a safe place for all students, where they can check their fears at the front door of the school. Unemployed graduates, dropouts, hookey players, and non-students hang around school grounds and enter the schools proper. Some way must be found to eliminate this element from the school area. In one school district, every

sured him that it was the long range goal of the DISD to solve the problems which Lusk had noted in his letter. There was no denial by Dr. Estes that these problems existed.

Lusk's concern with these problems became publicly known in May of 1969 when he attended a "face-to-face weekly meeting" between a Dallas City councilman and his constituents. At this meeting Lusk stated that "Our schools are breeding grounds for crime" and that there was a need for stricter enforcement of truancy laws. Lusk added, "This is not just a problem of the schools. The city needs to be concerned." These comments were reported in Dallas newspapers and immediately drew a public denial from Dr. Estes.

On June 25, 1969, Lusk appeared at a public meeting of the Board of Trustees. of the DISD and expressed his opinion regarding the causes and remedies for the demise of the ROTC program in the DISD, emphasizing the high truancy rate of his students. He pointed out the direct conflict between the commandants and the school principals regarding the need for stronger disciplinary measures for students who violated ROTC uniform and attendance regulations. Lusk further complained that there was a lack of activity funds to supplement the ROTC program. Several members of the Board wrote letters to Lusk thanking him for bringing the ROTC problem to their attention and congratulating him for presenting the problem "better than it had ever been presented before."

On July 25, 1969, Lusk met privately with Dr. Estes to discuss the matters he had previously presented to the Board of Trustees. However, no affirmative steps were taken by the DISD following these two meetings.

Lusk was reemployed for the 1969–70 school year. On January 6, 1970, the principal of Pinkston High School, Dr. Thomas Tolbert, submitted an evaluation of Lusk to the Assistant Superintendent for Personnel, John J. Santillo.[6] In his evaluation report Tolbert rated Lusk as "good" in three categories,[7] "acceptable" in seventeen categories, and "unsatisfactory" in three categories.[8] Lusk also received a general rating of "acceptable" and a prospective value rating of "good."[9] As a part of the evaluation, Tolbert recommended Lusk for reemployment as a teacher for the 1970–71 school year.

### B. After February 1, 1970

In the early months of 1970 Lusk again voiced his concern about certain problems at Pinkston High School. In a letter dated February 20, 1970, to the Senior Army Instructor of the ROTC Program for the DISD Lusk wrote:

> As long as this school continues to allow students to do as they please—come to school when they please; cut class when they please; wear uniforms when they please; attend parades when they please; wear beards, mustaches, face whiskers; allow long sideburns and long hair that covers the ears and hangs down over the col-

Junior and Senior High School has a police officer on duty in the school, and this has lessened crime not only in the school, but in the community as well, as the officer soon learns who the troublemakers are. We could well use this idea in our deprived schools."

6. This recommendation was in accordance with DISD policy requiring principals to submit each school year their evaluation of teachers. The names of teachers found to be incompetent and whose employment contracts should not be renewed for the ensuing school year had to be submitted by February 1. A recommendation of

nonrenewal could be made after February 1 for causes which arose after that date however.

7. The three "good" categories were general appearance, health, and knowledge of subject matter and professional training.

8. The three "unsatisfactory" categories were punctuality and reliability, tact and common sense, and cooperation and loyalty.

9. In March of 1969, almost a year earlier, Tolbert gave Lusk a general rating of "good" and a prospective rating of "excellent."

lar; take ROTC when they please; drop ROTC when they please; show disrespect towards the uniform, Army Instructors, American Symbols, Customs and Traditions; lie, cheat and steal; as well as other unacceptable practices and procedures; then the ROTC program becomes a game with the students to see who can get away with the most violations without punishment.

In another letter dated March 7, 1970, to the Deputy School Superintendent for Community Relations Lusk stated that the purpose of his letters was to alert the school administration to conditions which could "give rise to massive disorders in the schools and in the community." He further charged that there was a lack of concern for the students' welfare at Pinkston. He complained of students being assaulted and robbed in the building and on the school grounds and stated his belief that most faculty members at Pinkston were carrying weapons due to fear for their own safety. In addition, Lusk accused Principal Tolbert and his staff of being "mentally and sociologically unqualified to deal with modern, complex, multi-racial student bodies and communities." Although most of the statements of Lusk were critical of school policies, he did suggest several programs the DISD could adopt to solve these problems.

Lusk did not confine his criticism of school conditions to his letters to school officials. In February 1970 Lusk again expressed his previously stated concerns to officials of the City of Dallas. On the suggestion of a city councilman, Lusk appeared before the Dallas City Council on March 23, 1970, and related several instances of physical violence which occurred in connection with school activities. He suggested that police protection be provided for students and advocated closer cooperation between the police and school officials. With respect to the students at Pinkston, Lusk stated that "in order to survive, they learn to disobey authority, run, lie, cheat and steal." Two days later Lusk appeared at a meeting of the Board of Trustees of the DISD and substantially repeated his concerns. Both of these appearances were reported by the Dallas news media.

Following these public appearances Dr. Estes issued a statement to the news media strongly suggesting that Lusk should have directed his complaints through the grievance procedure of the DISD instead of publicly airing them. This was the first time that Lusk was directed to use the DISD grievance procedure in regard to his public criticism. On March 28, 1970, Lusk wrote a lengthy letter to Dr. Estes outlining the procedures he had taken to bring these problems to the attention of school officials and stating that he felt that these complaints could not be effectively resolved through the school grievance procedure.

At the trial of this case Tolbert testified that the ROTC program at Pinkston High School began to deteriorate about the same time that Lusk was making his public statements in early 1970 before the Dallas City Council and the Board of Trustees of the DISD. Tolbert noted that Lusk's students were not attending classes and had a poor attitude toward the ROTC program. Tolbert further testified that Lusk allowed his students to utilize the firing range without adult supervision,[10] and that the two sergeants who served under Lusk had complained to Tolbert prior to his 1970 evaluation of Lusk about his lack of leadership in the classroom. Tolbert also testified that the parents of some students telephoned him to complain of Lusk's public statements regarding the conduct of students at Pinkston. In addition, Tolbert testified that Black students in particular began to show a lack of interest in the ROTC program after

---

10. The allegation that the ROTC firing range was without adult supervision was not raised at the due process hearing before the school trustees; nor was it brought to Lusk's attention prior to the filing of this lawsuit.

Pinkston High School was subjected to a "Black revolution" which resulted in some disruption of school activities. While Tolbert testified that he discussed with Lusk the alleged deterioration of the ROTC program on a few occasions, he never informed Lusk that his teaching status was in jeopardy because of these problems. Nor was Lusk ever put on any probationary status. Furthermore, Tolbert testified that he made a report to the Senior Army Instructor on the ROTC program at Pinkston for the 1969–70 school year and had noted that the program was making a contribution to the school and that Lusk was an improvement over the prior ROTC instructor.

C. Recommendations of Nonrenewal of Employment

Following the culmination of the above events, in a letter dated May 13, 1970, Tolbert wrote to Lusk stating that he was not being recommended for reemployment for the 1970–71 school year. In this letter Tolbert set forth as the reasons for his recommendation that Lusk had "completely ignored steps in our staff organization and [had] gone directly to official meetings of the Board of Education . . . the Dallas City Council, and . . . the news media . . ." A copy of this letter was sent to Santillo, the Assistant Superintendent for Personnel, and Dr. Estes. On the same day Santillo wrote Lusk advising him that he had a right to an administrative review of Tolbert's decision. However, one day later Santillo wrote Tolbert stating that after carefully reviewing the causes which were listed in his letter of May 13 he felt those causes were insufficient to support a recommendation for nonrenewal of Lusk's employment contract. Santillo went on to list seven justifiable causes for dismissal of a teacher and concluded

his letter: "Therefore, it is my intention, based upon the information available, to recommend Captain Lusk for reemployment and reassignment to L. G. Pinkston Senior High School."[11]

On May 15, 1970, Tolbert wrote another letter to Santillo recommending that Lusk not be reemployed as a teacher. Tolbert stated in this letter that although he thought Lusk's "public" breach of ethics was self-evident, he would outline the reasons for this recommendation and he did so, as follows:

1. His [Lusk's] professional performance, by his own admission, has not been acceptable. He has experienced extreme difficulty in maintaining discipline in the Corp as evidenced *by his frequent public statements* ridiculing students concerning hair cuts, beards, and the wearing of R.O.T.C. uniforms. Further, he has *publicly pointed out* that the absentee rate in his class is inordinately high. Finally, I have received complaints from both Sergeants assigned to his command concerning his relationship with them and the students who he often describes as inferior-unable to learn.

2. Equally damning is his complete and utter failure to meet the accepted ethical standards of the profession. He has completely ignored established lines of communication in *widely discussing* alleged grievances. Included in these grievances are exhaustive and heated criticism of my staff and me. To date, Captain Lusk has not discussed these matters with me or my assistant. He has, however, *outlined his criticisms, which are unfounded, before the City Council, the News Media, to individual members of the City*

11. At trial Santillo testified that he had talked with Tolbert before May 13 and at that time Tolbert recommended that Lusk not be reemployed because of his failure to maintain discipline in his classroom. However, Santillo's trial testimony is clearly inconsistent with his letter of May 14 to Tolbert wherein he recommended that Lusk be reemployed.

*Council and the Board of Education* (emphasis added).

## D. The Hearing

Lusk was furnished a copy of Tolbert's letter of May 15, 1970, and immediately requested an administrative hearing to review Tolbert's decision. A hearing was held before the Board of Trustees on July 1, 1970, and Lusk appeared with his attorney. Tolbert and Santillo were the only witnesses who testified and Lusk's attorney was given an opportunity to cross-examine these witnesses and to present arguments in opposition to Tolbert's recommendation. Lusk's attorney argued that Lusk was being discharged in retaliation for his public appearances and statements. Following this hearing a majority of the Board of Trustees adopted Tolbert's recommendation and voted not to reemploy Lusk as a teacher. In making his decision in a written order the Board of Trustees stated that it confined its consideration solely to Lusk's performance as a teacher and rejected as irrelevant Lusk's public criticisms. It is from this decision that Lusk now seeks relief from this court.

## II. PROCEDURAL DUE PROCESS

■ The initial inquiry is whether Lusk was accorded procedural due process in the administrative proceedings which culminated in the nonrenewal of his employment contract. A teacher with an expectation of reemployment is entitled to certain minimal procedural guarantees which include a statement of the charges, the names of witnesses, the nature of the testimony of these witnesses, the opportunity to present a defense to the charges and a hearing before a tribunal that possesses both some academic expertise and an apparent impartiality toward the charges. Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1969). The testimony of Dr. Emmett Conrad, a Trustee, clearly indicates that in the light of the policies and practices of the DISD Lusk was justified in expecting continued employ-

ment and thus was entitled to the procedural guarantees set forth above. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

■ This court is of the opinion that there was a minimal compliance with procedural due process in this case. In Tolbert's letter of May 15, 1970, Lusk received a detailed notice of the reasons relied upon for his termination; this letter sufficiently alerted him to the fact that it was Tolbert who had suggested nonrenewal of his contract and contained a statement of the charges against him. Within a reasonable time thereafter Lusk was accorded an opportunity to appear before the Board of Trustees at a hearing with his attorney. Lusk's attorney was given the opportunity to cross-examine witnesses and to argue what he considered to be the real reason for the Lusk's nonrenewal of employment—Lusk's public statements. Additionally, this court finds that the Board of Trustees had a certain amount of academic expertise and an impartial attitude toward the charges. Moreover, neither before or during the hearing did Lusk or his attorney object to the procedural aspects of his case or suggest that the Board of Trustees was academically incompetent to render a professional decision. Duke v. North Texas State University, 469 F.2d 829, 841 (5th Cir. 1973). Therefore, this court finds that Lusk was afforded procedural due process in the proceedings leading up to and culminating in the decision of the Board of Trustees not to renew his employment contract.

## III. FIRST AND FOURTEENTH AMENDMENT RIGHTS

Having found that no federal right was openly violated in the procedures leading up to Lusk's termination, this court must next determine whether Lusk's exercise of his constitutional rights under the First and Fourteenth Amendments played an intimate role in the decision not to reemploy him.

## A. The Law

■ It can no longer be seriously asserted that teachers have no right to criticize their employers. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Duke v. North Texas State University, 469 F.2d 829 (5th Cir. 1973); Fluker v. Alabama State Board of Education, 441 F.2d 201 (5th Cir. 1971); Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1969). *Pickering* made it clear that a teacher's employment may not be conditioned upon the surrender of his constitutional rights. A citizen's right to engage in protected expression is substantially unaffected by the fact that he is also a teacher and, as a general rule, he cannot be deprived of his teaching position merely because he exercises these rights. This rule has been adopted so that the threat of termination of employment may not be used to inhibit the propensity of a teacher to exercise his constitutional rights of freedom of speech and association.

■ Because of his position in the educational system, a teacher is able to make a significant contribution to the public debate concerning the quality of education in the school in which he teaches. Pickering v. Board of Education, *supra*; Duke v. North Texas State University, *supra*. School authorities must nurture and protect, not extinguish and inhibit, the teacher's right to express his ideas. Only if the exercise of these rights by the teacher materially and substantially impedes the teacher's proper performance of his daily duties in the classroom or disrupts the regular operation of the school will a restriction of his rights be tolerated. Pred v. Board of Public Instruction, 415 F.2d 851 (5th Cir. 1969). The appropriate school officials must determine whether such circumstances exist, and if their determination is within the range where reasonable minds may differ, their decision will govern and be upheld. Butts v. Dallas Independent School District, 436 F.2d 728 (5th Cir. 1971).

■ The duty of this court, therefore, is to balance Lusk's rights as a teacher and as a citizen to comment on matters of public concern against the rights of the DISD to promote the efficiency and quality of its educational system. *Pickering, supra*, 391 U.S. at 568, 88 S.Ct. 1731. In this balancing this court cannot affirm the decision not to reemploy Lusk if it "was even partially in retaliation" for Lusk's public remarks which are constitutionally guaranteed under the First Amendment, even though there were valid nonconstitutional reasons for dismissal. Fluker v. Alabama State Board of Education, 441 F.2d 201, 210 (5th Cir. 1971). *See,* United States of America v. Northside Realty Associates, 474 F.2d 1164, at 1171 (5th Cir. March 14, 1973); NLRB v. Great Eastern Color Lithographic Corp., 309 F.2d 352, 355 (2d Cir. 1962).

## B. Constitutional and Nonconstitutional Reasons

The reasons given by Tolbert in his letter of May 15, 1970, for his recommendation of nonrenewal of Lusk's employment contract were:

1. Not able to maintain discipline in the corps.

2. Ridiculing students in the presence of other students.

3. Criticizing publically the Administration of his school and the city wide system, not using at any time the official procedure, the grievance procedure, as adopted by the Dallas School Board, and supported very emphatically by the Classroom Teachers of Dallas.

4. Unethical standards with teachers, students, Administration and community.

5. Would not support the Dallas Independent School District policies.

6. Made charges about crime in the corridors at L. G. Pinkston High School, damaging morale of students, teachers, the staff and the community.

It is clear from Tolbert's letters of May 13 and 15, and from his testimony before the Board of Trustees and this court, that the last four reasons set out above arise out of Lusk's public appearances and expressions and should be subjected to the "balancing of interests" test as set out in *Pickering*.[12]

(1). Failure to use the grievance procedure to criticize the school district

The grievance procedure referred into in reason 3 was adopted by the DISD on November 26, 1969. The purpose of this grievance procedure was to secure equitable solutions to the problems "which may arise affecting the welfare or working conditions of employees . . ." A grievance was defined as a "complaint . . . based on an alleged violation or inequitable application of the policies of the [school district] or a dispute involving the meaning, interpretation or application thereof."

The criticisms which Lusk made public before the City Council and the Board of Trustees were matters of vital interests to every citizen of Dallas, particularly those who had children in the public schools. His pronouncements re-

lated to school attendance, truancy laws, community and social problems which substantially affected the ability of students to achieve a meaningful education; the problem of crime in the schools and the need for more police protection. These matters were brought to the attention of governing bodies who had the power to act on these problems. Furthermore these statements were made in good faith and reflected a sincere concern by Lusk that these governing bodies become aware of these community and school problems which affect the quality of education—an issue of great public interest. Although the truth or falsity of these allegations was never proven, the evidence clearly reflects that at the time of their issuance, they were reasonably believed to be true by Lusk and were not knowingly false nor recklessly made.[13]

The evidence in the record, as indicated by Lusk's letter to Estes after he suggested the grievance procedure be utilized, clearly shows that Lusk went to great efforts to seek solutions to these problems within the administrative machinery of the school district before these problems were brought before the

12. The interests of the school board to be balanced are (1) the maintenance of discipline or harmony among students, school administrative personnel or harmony among students, school administrative personnel or fellow teachers; (2) the need for confidentiality; (3) the recognition that a teacher's false accusations may be hard to counter because of the teacher's presumed greater access to the real facts; (4) the making of statements which might impede the teacher's proper performance of his daily teaching duties; (5) the making of statements so without foundation as to call into question the teacher's competency to teach; (6) the existence of a close and personal working relationship between the teacher and a supervisor which calls for loyalty and confidence. Pickering, supra; Donahue v. Staunton, 471 F.2d 475, 481 (7th Cir. 1972).

The court must weigh these interests of the school board against the interests of a teacher to comment on matters of public concern and the interests of society in encouraging free exchange of ideas. Pickering, supra; United States v. Robel, 389

U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). This interest of society is a profound national commitment to the principle that debate on public issues be uninhibited, robust, and wide-open, even though it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials. New York Times v. Sullivan, 376 U.S, 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

13. Similar charges that crime was rampant in the schools were made by Mexican-American parents at a North Dallas parent-teacher's organization.

Tolbert's testimony at the procedural hearing before the Board of Trustees indicates that in response to Lusk's remarks before the City Council, the school district requested that regular policemen be assigned patrol of the Pinkston High School area and to be on duty there every afternoon at the close of school. Additionally, Tolbert did admit that there had been some fights in the halls of his school, but he stated that he had never been reluctant to call the Police Department.

Board of Trustees and City Council. Since these remarks were matters of public concern and reasonable efforts were made by Lusk to create an awareness of these problems within the administrative framework of the school district, the interest of the DISD to have these matters channeled through a grievance procedure does not justify the termination of Lusk's teaching contract under these circumstances.

### (2). Unethical Conduct

■ Tolbert has also charged that Lusk has been guilty of unethical conduct in his relations with teachers, students, the administration and the community. Courts have looked with great disfavor to catchall grounds such as "unethical conduct" which are capable of sweeping application and fail to inform the teacher with sufficient certainty what conduct is considered to be unethical. Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Richardson v. Board of Regents, 70 Nev. 347, 269 P.2d 265 (1954); Board of Trustees v. Owens, 206 Cal. App.2d 147, 23 Cal.Rptr. 710 (1962). When a teacher must guess whether an utterance may be determined "unethical," there is the danger that there will be a chilling effect upon the exercise of permissible First Amendment conduct. Keyishian, supra; Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

The only evidence of unethical conduct even remotely alluded to by Tolbert or the Board of Trustees is Lusk's criticism of his students as being "inferior", the ridiculing of his students, and failure to use the grievance procedure—all of which relate to Lusk's public expressions.

■ The allegation that Lusk labeled his students "inferior" relates to his statements to the City Council and Board of Trustees concerning the prob-

lems that his students faced both in the community and in school. Considered in their proper context these statements merely reflect the idea that students who come from an economically deprived community and who are exposed to the crime and violence which Lusk reasonably believed to have existed at Pinkston become "inferior" students. These allegations were a mere comment on the quality of education in the Dallas school district, a subject upon which Lusk, as a teacher, is most likely to have an informed and definite opinion. Furthermore, a teacher's conduct should be judged in its proper context and not in the terms of whatever distortion may be created by the news media or school officials who find these remarks distasteful to their own ideas.

The charge that Lusk ridiculed his students is also related to his public remarks as evidenced by Tolbert's letter of May 15, 1970, where he stated that Lusk has made "frequent public statements ridiculing students concerning haircuts, beards, and the wearing of ROTC uniforms." It is clear that Tolbert would not support Lusk in the enforcement of ROTC regulations regarding personal appearance. Lusk was specifically told by Tolbert that it was part of a student's culture to wear long hair and that if the hair was not on the student's shoulders, it was acceptable despite ROTC regulations. Lusk was obviously in the unenviable situation of having to enforce military appearance regulations without the support and the authority of the school principal. This matter was brought to the attention of school officials in charge of the ROTC program to no avail and this court cannot now accept the conclusion that Lusk was "unethical" in discussing this matter before the Board of Trustees.[14]

■ Furthermore, this court finds that it was not unethical conduct for

14. The same analysis is also applicable to Lusk's statement before the City Council that his "students must lie, cheat, and steal" in order to survive. The students of Pinkston High School lived in an area with a high rate of crime and violence.

These statements, considered in their proper context, were made in good faith and before a governmental body which had the authority to act on the problems cited by Lusk.

Lusk to make his public statements to City Council and the Board of Trustees instead of through the grievance procedure. As noted above, this court has determined that the subject matter of Lusk's public remarks was not a proper subject for the grievance procedure. Even if it were the proper subject matter for grievance procedure, Lusk made reasonable efforts to call these matters to the attention of school authorities through proper channels.

### (3). Failure to Support School Policies

The only reference to Lusk's failure to support school policies is his failure to use the grievance procedure. This court feels that the interest of society in encouraging teachers to speak out on matters affecting the quality of our schools far outweighs any interest of the DISD to have the grievance procedure resolve matters concerning crime, truancy and social problems affecting the quality of education. Under the limited circumstances of this case, it is unconstitutional to require Lusk to first use the school grievance procedure before exercising his First Amendment rights in regard to matters of public concern. Furthermore, when Lusk spoke before the Board of Trustees he was never informed by any of its members that his remarks should be pursued through the school grievance procedure.

### (4). Statements Damaging the Morale of Students, Teachers, Staff, and the Community

It is also alleged that Lusk made charges about crime in the school's corridors which damaged the morale of students, teachers, staff and community. There is no evidence that Lusk's public statements damaged the morale of his students and fellow teachers at Pinkston High School. The court does recognize that Lusk may have had disciplinary problems with his ROTC students over enforcement of military regulations and with his subordinate ROTC instructors, but there is no evidence that these problems arose from his public remarks.

As to the staff at Pinkston High School, it is obvious that Lusk's remarks in regard to crime in the schools was quite distasteful to Tolbert. As noted earlier Lusk's remarks were made in good faith and reflect a sincere concern that his students' education not be affected by crime and violence. There is evidence that Lusk spoke with Tolbert about these problems before going to the City Council and the Board of Trustees and Tolbert acknowledged that Lusk's behavior while at school has "always been professional to the extent that we have always been able to talk." This court can understand Tolbert's reaction when Lusk charged that there was crime in the corridors of Pinkston High School. However, Lusk's charges were not knowingly false or recklessly made, and there is evidence to support the conclusion that the charges were in fact true. Society's interest in information concerning the operation of its schools far outweighs any strain on the teacher-principal relationship which existed. Further, it was not shown, nor can it be presumed, that Lusk's public statements either impeded his performance as a teacher or disturbed the regular operation of the school. Any deficiencies Lusk may have had as a teacher were not shown to have been caused by his public utterances.

The evidence does reflect that as a result of the public remarks made by Lusk there was some unfavorable reaction from members of the Black community. Lusk testified that he received a number of phone calls at his home threatening violence. Tolbert testified that he received numerous irate complaints from parents of students at Pinkston High School following Lusk's public remarks. This unfavorable reaction was clearly a result of the news coverage of Lusk's remarks before the City Council and the Board of Trustees. Under these circumstances Lusk's conduct should be judged in terms of its propriety and not by the impression that may have been created in the minds of the public by the news media.

## C. Conclusion

This court concludes that the decision to terminate Lusk's employment with the DISD was substantially based on Lusk's public remarks to the City Council and the Board of Trustees. This court also concludes that the application of the *Pickering* "balancing of interests" test dictates that the decision to terminate Lusk was violative of his First and Fourteenth Amendment rights. The holding in Fluker v. Alabama State Board of Education, demands that relief be afforded a teacher even if the school board's "action was even *partially* in retaliation for [his] . . . anti-administration activities." 441 F.2d 201, 210 (5th Cir. 1971) (emphasis added). Accordingly, Lusk is entitled to reinstatement and back pay at the rate he would have received had his contract of employment been renewed to the present time. The court is also of the opinion that the conduct of the Board of Trustees was not unreasonable and obdurately obstinate and therefore an award of attorney fees should be denied. Rainey v. Jackson State College, 481 F.2d 347 (5th Cir., filed June 27, 1973).