Original
No. 7383

EDWARD J. BENNETT

v.

MELDRIM THOMSON, JR.
JAMES H. HAYES
LYLE E. HERSOM
LEON G. YEATON
LOUIS D'ALLESANDRO
BERNARD A. STREETER, JR.

July 30, 1976

454

*Sheehan, Phinney, Bass & Green* and *James E. Higgins (Mr. Higgins orally)* for the plaintiff.

*Perkins & Brock (Mr. David A. Brock orally)* for the defendants.

GRIFFITH, J. Petition for writ of certiorari seeking review of

the decision of the defendants, the Governor and members of the Executive Council, dismissing the plaintiff, Edward J. Bennett, from his position as director of the division of economic development.

On June 26, 1974, the Governor and Council appointed the plaintiff as director of this division in the department of resources and economic development for a term of years expiring April 1, 1978. George Gilman was commissioner of the department of resources and economic development during the period of the plaintiff's employment and the plaintiff was subject by statute to the supervision and control of the commissioner in the operation of his division. RSA 12-A:2; RSA 12-A:3 (Supp. 1975).

In December 1974, Commissioner Gilman learned that the Parsons and Whittemore Company was considering locating a pulp mill in New Hampshire. The Governor and the commissioner actively supported and advocated the Parsons and Whittemore pulp mill location in the State. The charges that resulted in the removal of the plaintiff from office arose from a speech he delivered on June 18, 1975, to the Manchester Chamber of Commerce in his official capacity as director of the division of economic development. In the question and answer period that followed Bennett was asked:

"How do you see the proposed $200,000,000 pulp mill in the Connecticut River Valley benefiting the State of New Hampshire?"

The plaintiff responded as follows:

"I'll be short and sweet on that one. The official policy of the Administration because Governor Thomson unilaterally announced that the pulp mill will locate in the Connecticut River Valley, his official state policy is that we are pro pulp mill and it's official department policy we are pro pulp mill. And it's official division policy that we are pro pulp mill. But I got chewed out two weeks ago by the Governor for speaking up on snow-making at Mount Sunapee where I opposed spending $850,000 for putting and making snow flakes for a few skiers when we have unemployed in the state. I think it was wrong and I think it's wrong now. But he told me that he expected me to, if I was going to be on the team that when he blew the

whistle that I would be on the field on his side, so, but I'm going to get off the field for just one minute and go on the bench and say that I think that the idea of a pulp mill stinks. It contravenes everything that this state everything that we are trying to do, that I've talked to you about, about quality, it would be a catastrophe in my judgment. Don't quote me on that. I don't think that works with the Governor."

Upon learning of these remarks, the Governor wrote to the plaintiff and requested his resignation. Bennett refused, and on July 21, 1975, the Governor and Council passed a resolution in the nature of a petition for the plaintiff's removal, having first determined by resort to this court that they, rather than the commissioner of resources and development, constituted the "appointing authority" of the director of economic development, within the meaning of RSA 4:1. *Opinion of the Justices,* 115 N.H. 385, 341 A.2d 758 (1975). On September 25, 1975, a hearing on the petition was held by the Governor and Council, at which findings were made that Bennett's statements on June 18 were contrary to established and divisional policy, and were in direct contravention of instructions which Bennett had received from Commissioner Gilman. Accordingly, it was determined that Bennett be removed "for the good of the department." The findings and order were signed by the Governor and three Councilors. Councilors D'Allesandro and Streeter noted their dissenting votes. Bennett's motion for rehearing was denied by the defendants on October 29, 1975.

## I.

Plaintiff Bennett contends that his discharge on the basis of remarks made by him on matters of public concern violates his constitutional right to freedom of speech guaranteed by the first amendment to the Constitution of the United States. Consideration of the plaintiff's first amendment claim must be in the light of the statutes applicable to his duties and the events, as found by the Governor and Council, which preceded the public statement of the plaintiff on June 18, 1975. Since the facts found by the Governor and Council are supported by evidence and are not unreasonable or arbitrary, we are limited to a determination of whether on the facts found plaintiff could legally be dismissed.

*Quinn v. Concord,* 108 N.H. 242, 233 A.2d 106 (1967).

RSA 12-A:1-c enumerates certain powers and duties of the department of resources and economic development. Among them is "the power and duty to plan and conduct a program of information and publicity to attract ... industrial concerns ... from outside the state to the state of New Hampshire, and also to encourage, coordinate, and participate in the efforts of other public and private organizations or groups of citizens in order to publicize the facilities, industrial advantages and other attractions of the state for the same purposes." Within the department, the responsibility for carrying out the statutory duties of the department concerning industry rests with the division of economic development.

RSA 12-A:2 provides in pertinent part that "[d]irectors of departmental divisions shall be subject to the supervisory authority of the commissioner, which authority shall include power to establish department and divisional policy as well as to control the actual operations of the department and all divisions therein."

In December 1975 and January 1976, as a result of discussions with Commissioner Gilman, the plaintiff was informed of the Parsons and Whittemore Company's interest in building a pulp mill in New Hampshire and that the commissioner had determined that the department would assist and encourage the company to locate in New Hampshire. In a memorandum to the commissioner dated February 3, 1975, Director Bennett set forth his opposition to the Parsons and Whittemore project and at the suggestion of the commissioner further documented his dissent in a memorandum of February 13, 1975. This memorandum concluded with the following sentence. "Accordingly, I respectfully request to be excused from an official or unofficial capacity in either advocating or defending the proposition."

After the above memorandum, the commissioner informed Director Bennett that because of his feelings about the mill the commissioner would undertake to speak for the department in furtherance of departmental policy of encouraging the location of the mill in New Hampshire. The commissioner instructed Bennett that he should avoid discussion of his position or any position on the mill. Both the plaintiff and the defendants agree that the plaintiff's first amendment claim is governed by *Pickering v. Board of Education,* 391 U.S. 563 (1968), the Supreme Court's major discussion of the first amendment rights of public employees. Understandably, they differ in their application of the *Pickering*

standard to the present case.

In *Pickering*, the Court stated: "[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Applying that test, the Court went on to state: "What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools in general. In these circumstances, we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 572-73.

The first amendment rights of public employees enunciated in *Pickering* do not prevent the government by statute from forbidding activities including speech which are hazardous to fair and effective government. *CSC v. Letter Carriers*, 413 U.S. 548 (1973). Nor do first amendment rights prevent the discharge of an employee who has made statements which seriously impair the effectiveness of his performance, and substantially impede the very tasks he was assigned to accomplish. *Arnett v. Kennedy*, 416 U.S. 134 (1974); *Goldwasser v. Brown*, 417 F.2d 1169, 1176-77 (D.C. Cir. 1969); *Meehan v. Macy*, 392 F.2d 822 (D.C. Cir. 1968), *modified* 425 F.2d 469, *aff'd en banc*, 425 F.2d 472 (D.C. Cir. 1969); Grossman, *Public Employment and Free Speech: Can They Be Reconciled?*, 24 Ad. L. Rev. 109 (1972).

In *Pickering v. Board of Education, supra* at 574, it is stated: "[I]n a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be." Contrary to the situation in *Pickering* "the fact of employment" is here directly and substantially "involved in

the subject matter of the public communication made."

The director of economic development in the furtherance of his statutory duty to attract industry to the State acts through the spoken and written word. The facts found by the Governor and Council support their conclusion that the plaintiff's remarks on June 13, 1975, were knowingly insubordinate and seriously compromised his ability to effectively carry out the responsibilities of the department. Under these circumstances, his removal "for the good of the department of resources and development" does not violate his first amendment rights. *Arnett v. Kennedy supra; Goldwasser v. Brown supra; Meehan v. Macy supra.*

## II.

Plaintiff argues that the provision of RSA 4:1 authorizing removal from public office "for the good of the department" is unconstitutionally vague. In upholding similar language found in 5 U.S.C.A. § 7501 (a), the Lloyd-LaFollette Act, the United States Supreme Court quoted with approval the following statement from *Meehan v. Macy supra,* 392 F.2d 822, 835: "[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees include 'catch-all' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.' We think it is inherent in the employment relationship as a matter of common sense if not [of] common law that [a Government] employee . . . cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory [cartoons] . . . [Dismissal in such circumstances neither] comes as an unfair surprise [nor] is so unexpected as to chill . . . freedom to engage in appropriate speech." *Arnett v. Kennedy,* 416 U.S. 134, 161-62 (1974).

RSA 4:1 proscribes "only that public speech which improperly damages and impairs the reputation and efficiency of the employing agency, and it thus imposes no greater controls on the behavior of [state] employees than are necessary for the protection of the [State] as an employer." *Arnett v. Kennedy,* 416 U.S. at 162. Accordingly, we hold that the language "for the good of the department" in RSA 4:1 is neither void for vagueness nor overbroad.

### III.

Plaintiff contends that Commissioner Gilman had no authority under the statute to establish a valid departmental policy in favor of the pulp mill without consultation with the advisory commission. Commissioner Gilman testified that he did not consult with the advisory board on the pulp mill since he interpreted the requirements of RSA 12-A:2 as requiring such consultation only on administrative changes or realignment of functions within the department. Because the attraction of industry to the State is a duty specifically assigned to the department by RSA 12-A:1-c, the determination to assist in the location in the State of a specific company was not a matter of general "policy" contemplated by RSA 12-A:2.

The commissioner's interpretation of the statute is correct and agrees with the direction to the commissioner contained in RSA 12-A:2 which states: "The commissioner shall consult with the advisory commission prior to the establishment of general and divisional departmental policy." Obviously a commission with a mandate by statute of four meetings a year (RSA 12-A:6) is not intended as a consultation commission to deal with "the actual operation" of the division (*See* RSA 12-A:2) such as decisions on the assistance to be offered individual companies.

### IV.

We cannot accept plaintiff's argument that RSA 4:1 does not authorize the Governor and Council to both initiate and judge the proceedings against him. The statute provides that either the attorney general or the "appointing authority" of the official may institute proceedings for removal and that the Governor and Council shall hold a public hearing upon the removal petition. At the time RSA 4:1 was enacted, the legislature was aware that the Governor and Council were the "appointing authority" for most offices. Accordingly, it appears that the legislature intended that in cases such as this, removal proceedings would be conducted by the same parties who brought the charges. *Quinn v. Concord,* 108 N.H. 242, 244-45, 233 A.2d 106, 108 (1967).

Neither can we accept the argument of the plaintiff that a statutory scheme that combines these functions is a denial of due process. "The case law, both federal and state, generally rejects the idea that the combination with judging of prosecuting or investigating functions is a denial of due process . . . ." 2 K. Davis,

Administrative Law Treatise § 13.02, at 175 (1958); *Withrow v. Larkin,* 421 U.S. 35 (1975); *Farrelly v. Timberlane Regional School Dist.,* 114 N.H. 560, 565, 324 A.2d 723, 726 (1974); *Quinn v. Concord,* 108 N.H. 242, 244-45, 233 A.2d 106, 108 (1967); *cf. Burhoe v. Whaland,* 116 N.H. 222, 356 A.2d 658 (1976).

## V.

Plaintiff alleges that Governor Thomson and Councilors Streeter and Yeaton should have recused themselves for bias. In all three cases, this is based largely on the fact that the Governor asked for plaintiff's resignation and the two Councilors publicly suggested that the plaintiff should resign. A request or suggestion that an official resign does not indicate a prejudgment of the issue of an official's dismissal for cause. Both Councilors Streeter and Yeaton recognized the distinction at the time and gave no indication of any prejudgment of plaintiff's case. In the case of the Governor, there is no indication that the request for resignation carried with it a prejudgment of the dismissal petition. In the case of Councilor Streeter, the charge of bias loses some force as a result of the Councilor's negative vote on plaintiff's dismissal.

Where the legislature has determined that the formal institution of removal proceedings does not disqualify the Governor and Councilors from adjudicating the case, we are unable to say that a request for resignation has any different effect. *Quinn v. Concord,* 108 N.H. 242, 244-45, 233 A.2d 106, 108 (1967).

Plaintiff's final argument is that he should have been allowed to conduct a *voir dire* of the challenged officials. While RSA 500-A:22 (Supp. 1975) provides for *voir dire* in the case of jurors, no authority, statutory or otherwise, has been cited to us for the proposition that a party is entitled to interrogate presiding judicial officers. Accordingly, we find that the Governor and Council committed no error in denying the plaintiff's motion.

*Petition dismissed.*

KENISON, C.J., and GRIMES, J., dissented; the others concurred.

KENISON, C.J., dissenting: Some time ago in a lone and lonely dissenting opinion I concluded that State employees were not second-class citizens who were required to give up their constitutional rights for the privilege of engaging in public employment.

*Ratti v. Hinsdale Raceway*, 109 N.H. 270, 274, 249 A.2d 859, 862 (1969); Powell, *The Right to Work For the State*, 16 Colum. L. Rev. 99 (1916); Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law*, 81 Harv. L. Rev. 1439 (1968). Recent opinions have not diluted the validity of that conclusion. *Elrod v. Burns*, 96 S. Ct. 2673 (1976). "The problem . . . is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).

In 1964, the Constitutional Convention recommended and adopted an amendment specifically providing for freedom of speech. Mr. Bittenbender of Deering explained the amendment as follows: "What we have proposed to you, as amended, provides simply that the right of free speech which is, of course, an essential part of our heritage, is spelled out very clearly in the Constitution. The Constitution presently has several references to it so that inferentially you can presume that the right to free speech is guaranteed in our New Hampshire Constitution. The right is, of course, guaranteed under our Federal Constitution. What we wanted to do was to be absolutely certain the Constitution was clear, that there could be no possible misunderstanding or misinterpretation of it. And we felt that the right to free speech should, consequently, be enunciated in the Constitution and we had included it with that part which relates to the liberty of the press . . . ." N.H. Jour. Const. Conv. 218 (1964). This amendment was approved by the people of the State by a vote of 185,340 in favor to 27,797 opposed. This amendment was approved in 1968 by 86.95% of the voters which was the highest percentage received for constitutional amendments in recent years. Consequently, N.H. CONST. pt. I, art. 22 (Supp. 1975) now reads as follows: "Free Speech; Liberty of the Press. Free speech and liberty of the press are essential to the security of freedom in a state: They ought, therefore, to be inviolably preserved."

The constitutional command of the New Hampshire constitution and the first amendment to the United States Constitution does not permit the discharge of the plaintiff from State service on the grounds of insubordination in the circumstances of this case. It is frequently easier to attempt to silence a critic than to answer him. But we have chosen a different system of government, one in which "the fitting remedy for evil counsels is good

ones." *Whitney v. California,* 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

GRIMES, J., dissenting: As I believe that the plaintiff's dismissal was in violation of his rights under the first amendment to the Constitution of the United States and his rights under part I, article 22 of the New Hampshire constitution, I must respectfully dissent from the opinion of the court.

It is too late in the day to argue that public employment is a privilege which can be conditioned on the surrender of constitutional rights which could not be abridged by direct government action. *Keyishian v. Board of Regents,* 385 U.S. 589 (1967); *Garrity v. New Jersey,* 385 U.S. 493, 500 (1967); Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law,* 81 Harv. L. Rev. 1439, 1445-46 (1968). The State "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech." *Perry v. Sindermann,* 408 U.S. 593, 597 (1972); *see Chitwood v. Feaster,* 468 F.2d 359 (4th Cir. 1972).

It should be stressed that the plaintiff had given a talk to the chamber of commerce concerning a topic that in no way related to the pulp mill issue. Immediately following the talk, plaintiff was asked to participate in a question and answer period. It was at this point that a private citizen asked the plaintiff for his opinion concerning the establishment of the pulp mill. After articulating the department policy as to the pulp mill, the plaintiff gave his opinion on the project while making it clear it referred only to his personal opinion. There is no claim and no evidence that plaintiff was actively promoting his personal views on the pulp mill as opposed to the departmental policy, or that he has been publicly attacking the official policy. The sole basis for the dismissal was his honest response on this one occasion to a direct question. The petition for removal specifically articulates that the plaintiff's statement constituted insubordination so as to justify dismissal.

The question and answer concerned a matter of vast political and economic importance for the residents of the State, and as such there can be no doubt that it falls within the parameters of free speech protection. As the right of free speech is not absolute, particularly in the area of public employment, it is the court's responsibility to determine whether a dismissal because of the exercise of free speech rights is unconstitutionally restrictive. Although disagreeing with the majority's result, I do agree that

*Pickering v. Board of Education,* 391 U.S. 563 (1968), does provide the standard of review in cases involving public employment and first amendment claims. *Muller v. Conlisk,* 429 F.2d 901 (7th Cir. 1970); *Ruderer v. United States,* 412 F.2d 1285 (1969); *Brukiewa v. Police Commissioner,* 257 Md. 36, 263 A.2d 210 (1970); Grossman, *Public Employment and Free Speech: Can They Be Reconciled?,* 24 Ad. L. Rev. 109 (1972).

Since the plaintiff's first amendment rights are being infringed, the defendants have the burden of proving that the State's interest in efficiency in public service outweighs the plaintiff's interest in free speech and the interest of society in free and open debate in matters of public concern. *Pickering v. Board of Education,* 391 U.S. at 568, 573; *see Virginia Pharmacy Bd. v. Virginia Consumer Council,* 96 S. Ct. 1817 (1976).

The defendants have failed to show that the functions of the department of resources and economic development were being substantially impeded by the plaintiff's statement. The defendants have failed to justify their contention with reasonable inferences flowing from concrete facts, but rather have merely abstractly suggested that the interests of the department were materially and substantially jeopardized. A mere tendency to impede the function of the department is not sufficient to limit the plaintiff's first amendment rights. *Abbott v. Thetford,* 529 F.2d 695 (5th Cir. 1976); *Hostrop v. Board of Junior College Dist. No. 515,* 471 F.2d 488, 492 (7th Cir. 1972); *James v. Board of Education of Central Dist. No. 1,* 461 F.2d 566, 571 (2d Cir. 1972), *cert. denied,* 409 U.S. 1042 (1972); *L. A. Teachers Union v. L. A. City Bd. of Ed.,* 71 Cal. 2d 551, 455 P.2d 827, 78 Cal. Rptr. 723 (1969). It is not the content of the statement that is controlling, but rather the impact of the speech. Note, *Judicial Protection of Teachers' Speech: The Aftermath of Pickering,* 59 Iowa L. Rev. 1256, 1267 (1974).

The defendants have also failed to show that plaintiff's statement impeded his performance as director of the division of economic development. *Gieringer v. Center School Dist. No. 58,* 477 F.2d 1164 (8th Cir. 1973); *Lusk v. Estes,* 361 F. Supp. 653, 655 (N.D. Tex. 1973). I fail to see and defendants have failed to prove how plaintiff's single statement can cause any significant damage to the working relationship with his superiors. The citizenry's interest in information concerning the pulp mill far outweighs any possible strain in the superior-subordinate relationship. In any event, there can be no governmental interest in "preventing the sort of disharmony which inevitably results from mere expression

of controversial ideas." *L. A. Teachers Union v. L. A. City Bd. of Ed.,* *supra* at 561, 455 P.2d at 833, 78 Cal. Rptr. at 729; *Lusk v. Estes,* *supra* at 663; *Starsky v. Williams,* 353 F. Supp. 900, 923-24 (D. Ariz. 1972), *modified,* 512 F.2d 109 (9th Cir. 1975).

As to the impact of plaintiff's statement on the public, the defendants have failed to show that the statement resulted in an unjustifiable loss of public confidence in the department of resources and economic development and caused actual damage to its integrity.

But the factor which must be of greatest weight is the existence or nonexistence of an issue of legitimate public concern. The issue of the establishment of a major pulp mill within the State of New Hampshire is of vital political, economic, and environmental concern to many of New Hampshire's citizens. As the public's concern with a matter increases, the State's interest in restricting speech correspondingly decreases. Note, *Judicial Protection of Teachers' Speech: The Aftermath of Pickering, supra* at 1261; *Donahue v. Staunton,* 471 F.2d 475, 481 (7th Cir. 1972), *cert. denied,* 410 U.S. 955 (1973); Gatti, *Teachers and the First Amendment,* 7 Willamette L.J. 435 (1971). Certainly this issue was of such legitimate public concern as to outweigh any interest the State may have had in restricting speech.

Although plaintiff can be dismissed for failing to fulfill his statutory duties, he cannot be dismissed under the guise of "insubordination" for exercising first amendment rights, particularly under the circumstances of this case where the statement involves a matter in which the public's right to know is so substantial. Dismissal of State employees should not be used so as to stifle the free and unhindered debate on matters of public importance, which is the core value of the free speech clause of the first amendment and part I, article 22 of the New Hampshire constitution and lies at the very foundation of our free society. *Marsh v. Alabama,* 326 U.S. 501 (1946).

As I would hold that plaintiff's dismissal was in violation of his first amendment rights, I would not reach the other issues presented by this transfer.