Personnel Appeals Board
No. 93-597

### APPEAL OF JOREL BOOKER
#### (New Hampshire Personnel Appeals Board)

January 25, 1995

338

*Backus, Meyer, Solomon & Rood*, of Manchester, and *Michael Reynolds*, general counsel, State Employees Association of New Hampshire, Inc., of Concord, (*Jon Meyer* and *Mr. Reynolds* on the brief, and *Mr. Meyer* orally), for the petitioner.

*Jeffrey R. Howard*, attorney general (*Martha A. Moore*, assistant attorney general, on the brief and orally), for the respondent.

BROCK, C.J. The petitioner, Jorel Booker, appeals from the decision of the New Hampshire Personnel Appeals Board (board) affirming a disciplinary warning based on certain statements regarding the New Hampshire Division for Children and Youth Services (DCYS) that he made to a newspaper reporter. He contends that DCYS violated RSA 98-E:1 (1990), part I, article 22 of the New Hampshire Constitution, and the first amendment of the United States Constitution when it punished him for giving opinions as an individual State employee on matters concerning the State and its policies. We reverse.

In the summer of 1991, DCYS was under considerable public scrutiny following the release of a University of Southern Maine study of eight cases in which children died or were seriously injured after contact with DCYS. In early September 1991, Eric Waldman, a reporter for NEW HAMPSHIRE SEACOAST SUNDAY, spent an entire day at the

Portsmouth district office of DCYS researching an article about "what it was like to be an employee at an agency that was being so heavily criticized." The visit had been arranged in advance by DCYS Deputy Director Robert Pidgeon and was conducted with his knowledge and approval. Pidgeon also was interviewed for and quoted in the article. The particular comments that prompted the petitioner's warning letter were made during the course of an interview conducted outside the office during a break in the petitioner's work day. On September 8, 1991, the article entitled, "Damned if they do; damned if they don't," appeared in the newspaper. The petitioner was quoted as stating, "There are kids in New Hampshire who are in far worse condition than they were before the [S]tate intervened in their lives . . . . There are kids who would be alive today but for the inefficiency of [DCYS]."

After the article appeared, Pidgeon and another DCYS official met with the petitioner and sought specific information to which the petitioner was referring when he made the statements. Pidgeon considered the results of that meeting and a subsequent meeting on the same subject to be unsatisfactory, and issued the warning letter on September 26, 1991.

The warning was issued on two separate grounds. First, the warning was in response to the petitioner's "utterance of unsubstantiated statements related to the deaths of children." The letter stated that at the meetings directly after publication of the article, the petitioner "acknowledged that [he] had no specific information regarding the deaths of any children, and that the only information [he] had was hearsay gleaned over five and one half years as a [social worker]." The warning also rests on the contention that the petitioner's "statement was not qualified by stating that it was [his] personal opinion," and that "thus any person reading [his] statement would assume that it was made in [his] professional capacity."

After unsuccessfully exhausting his appeal remedies within the agency and the division of personnel, the petitioner appealed to the personnel appeals board. After a hearing, the board found that the petitioner was "not disciplined for making derogatory or unpopular statements about [DCYS], but for making unsubstantiated statements about the relationship between inefficiency at DCYS and the deaths of children . . . ." The board concluded that "[w]hile there may be a fine distinction between the statement of opinion and the statement of fact in this case, [the petitioner] made a statement which he offered as a matter of fact, not as a matter of opinion, and which he later could not substantiate." The board upheld the warning letter based on RSA 98-E:1.

On appeal, we will reverse the board if it made an error of law or if "the court is satisfied, by a clear preponderance of the evidence

before it, that such order is unjust or unreasonable." RSA 541:13 (1974). The board's findings of fact are presumed to be lawful and reasonable. *Id.*

Before we consider whether the board applied RSA chapter 98-E correctly, we must determine the relationship between the chapter and our previous jurisprudence regarding the free speech rights of government employees. Because the free speech rights of government employees are granted at least as much protection under the New Hampshire Constitution as under the United States Constitution, we make no separate federal analysis, *State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 350–51 (1983), and cite federal cases as an aid to our analysis. *State v. Maya*, 126 N.H. 590, 594, 493 A.2d 1139, 1143 (1985).

■ It is settled first amendment law that the government, when acting as an employer, must respect the first amendment rights of its employees. *Connick v. Myers*, 461 U.S. 138, 142 (1983). To be protected under federal constitutional standards, the government employee's speech must relate to a matter of public concern, and the employee's interest in expression on the matter must not be outweighed by any injury the speech could cause to "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968); *see Connick*, 461 U.S. at 142. In 1976, we applied the *Pickering* test under the first amendment to uphold the dismissal of a government employee who had been terminated for insubordination based upon a public statement regarding a matter of public concern. *Bennett v. Thomson*, 116 N.H. 453, 458–59, 363 A.2d 187, 190–91 (1976), *appeal dismissed*, 429 U.S. 1082 (1977).

In 1979, the legislature enacted RSA chapter 98-E. Laws 1979, 433:1. RSA chapter 98-E provides that each State employee has "a full right to publicly discuss and give opinions as an individual on all matters concerning the state and its policies." RSA 98-E:1. The chapter further prohibits any person from interfering "in any way with the right of freedom of speech, full criticism or disclosure by any state employee." RSA 98-E:2 (1990). The only limitation on a State employee's exercise of free speech under the statute is that one may not disclose confidential or privileged records or communications. RSA 98-E:3 (1990).

■ A plain reading of RSA 98-E:1, *see* RSA 21:2 (1988), indicates that the section protects State employees' rights to freedom of expression more broadly than the United States Supreme Court jurisprudence under *Pickering. See Waters v. Churchill*, 114 S. Ct. 1878, 1884–85 (1994). While the balancing test we applied in *Bennett* places limits on a government employee's right to free speech, RSA

98-E:1 grants State employees a "full right" to discuss publicly all matters, and to "give opinions as an individual on all matters concerning the state and its policies." We conclude that this section serves to free a State employee's speech rights from the limits imposed by the *Pickering* and *Bennett* balancing test. The fact that the legislature specifically excepted only the disclosure of confidential communications and records from this "full right" strengthens this conclusion. *See* RSA 98-E:3. Accordingly, we will not balance the petitioner's first amendment interests against the government's interests under *Bennett*. We analyze the DCYS warning letter solely under RSA chapter 98-E.

Most important to our analysis is the language of RSA 98-E:1 itself, that a State employee may "give opinions as an individual" on matters of State concern. No one contests that the content of the petitioner's statements addressed a matter of great State concern. Therefore, we must consider whether the petitioner gave his "opinions as an individual" in this case.

■ When we interpret statutes, our task is to determine legislative intent, beginning with the language of the statute itself. *Silva v. Botsch*, 120 N.H. 600, 601, 420 A.2d 301, 302 (1980). "When that language is plain and unambiguous, we need not look beyond the statute for further indications of legislative intent." *Id.* When interpreting statutes, we "ascribe[] to statutory words and phrases their usual and common meaning, unless the statute itself suggests otherwise." *Id.* The common and usual meaning of "individual" is "a single or particular . . . human being as contrasted with a social group or institution." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1152 (unabridged ed. 1961). An "opinion" is commonly understood to be "a view, judgment, or appraisal formed in the mind about a particular matter or particular matters." *Id.* at 1582.

■ In the warning letter, Pidgeon stated that the petitioner did not qualify his remarks by "stating that it was [his] personal opinion, [and that] thus any person reading [his] statement would assume that it was made in [his] professional capacity." We consider these to be two separate issues. We note initially that RSA 98-E:1 grants protection to speech made "as an individual." We consider the relevant distinction to be whether the petitioner spoke as an individual or as a spokesperson for DCYS, rather than whether he spoke as a citizen or as a citizen who happens to be an employee of DCYS.

The record contains no evidence that the petitioner indicated to Waldman that his statements represented the position of DCYS. At the hearing, when asked whether the petitioner was speaking in his capacity as a social worker when he made the remarks, Waldman

replied that "[h]e was a social worker. I was talking to him as an individual. I didn't ask him to respond in any particular capacity, but he's a social worker, and obviously that's why I'm talking to him." As the petitioner stated at the hearing:

> I was speaking for myself . . . . I believe I was speaking for myself, as an individual, who had knowledge of the agency. Obviously, I'm a social worker all the time, as long as I'm employed by the agency, but I spoke as a citizen, as Jorel. I spoke of my feelings and of my beliefs.

When asked whether he considered the petitioner's remarks to be his individual point of view or the position of DCYS, Waldman acknowledged a distinction between the official stance of the agency and the feelings of individual employees. He stated, "[i]n fact, that's why I interviewed Mr. Pidgeon, the previous day, to get the official positions of the agency." Given the common understanding of the word "individual" and the circumstances of this case, we conclude that the petitioner was speaking as an individual when he made his remarks to Waldman. *See Appeal of City of Portsmouth, Bd. of Fire Comm'rs,* 137 N.H. 552, 555, 630 A.2d 769, 770–71 (1993) ("The conclusion as to where the line [between observations by a public official in conversation in private life and the same observations expressed in an official capacity] must be drawn is driven by the facts of the case.").

The State next contends that the petitioner's language was unprotected by RSA chapter 98-E because his comments were given not as an opinion, but as a matter of fact. At the hearing, the petitioner gave uncontroverted testimony that he prefaced his remarks with "in my opinion" or "in my belief." These qualifying remarks were not printed in the newspaper, however. When asked for the basis for his statement that there were children who would be alive today but for the inefficiency of DCYS, the petitioner stated:

> I was speaking in generalities. Children have died in the care of the agency. The agency has done things in an inefficient manner. And I've taken the position that if we had done things differently, there is a possibility and a very strong probability we'd have a different outcome. I still stand by that. . . . Do I know specific deaths? Yes. Do I know specific inefficiencies? Yes. And do I believe that those things together mean some were preventable, yes. And I still hold that belief.

When asked about the petitioner's demeanor when he made the statements, Waldman replied:

> [The petitioner] was expressing feelings that he held very strongly. It was obviously [an] issue[] that he thinks quite a

bit about, and is deeply concerned about. He struck me as an individual who is deeply concerned about the role of DCYS and how [it] functions at a time when its services are obviously quite desperately needed. I took him to be a very good critic of the system, because he was a participant in it, and that's why his comments played such an important role in my story.

While testifying before the board, Pidgeon agreed that there are children who have died while under the control of DCYS. For purposes of this opinion, it appears that neither DCYS nor the petitioner disputed that DCYS suffers from inefficiencies and that children have died while under the control of the agency. Whether the petitioner's assertion of a causal relationship between these two elements was presented as a metter of fact or of opinion is the question. At oral argument, the State conceded that if DCYS failed to remove a child from the child's home and the child subsequently died, the inefficiency of DCYS *arguably* could have been a cause of that child's death. In its decision, the board noted that there is a "fine distinction" between statements of opinion and of fact. We consider this distinction to be a legal, not a factual, one. We find as a matter of law that the petitioner's statements regarding the relationship between the welfare of children and the inefficiency of DCYS to have been his informed opinion, his "view, judgment or appraisal" of this matter of grave public concern. *See Webster's Third New International Dictionary* at 1582. Accordingly, his statements were protected under the plain meaning of RSA 98-E:1. We do not decide today whether a State employee would lose protection under RSA 98-E:1 if the employee made inaccurate statements of fact while discussing publicly a matter concerning the State or its policies.

For the foregoing reasons, we reverse the decision of the board and order that the letter of warning dated September 26, 1991, be removed from the petitioner's file and records.

*Reversed.*

All concurred.