**Elizabeth FUJIWARA and Ira Vanterpool, Plaintiffs,**

v.

**Charles G. CLARK, Individually and in his capacity as Superintendent, Department of Education, State of Hawaii, Thomas Yamashita, Individually and in his capacity as Director, Management Audit and Civil Rights Branch, Department of Education, State of Hawaii, Rev. Darrow L. K. Aiona, Hubert P. Minn, George S. Adachi, Dr. Richard Ando, Marion Saunders, Ruth Tabrah, Howard I. Takenaka, Hiroshi Yamashita and Noburo Yonamine, in their capacities as Members, Board of Education, State of Hawaii, Defendants.**

**Civ. No. 78–0062.**

United States District Court,
D. Hawaii.

June 8, 1978.

See also D.C., 477 F.Supp. 809.

Paul Alston, Honolulu, Hawaii, for Fujiwara.

American Civil Liberties Union of Hawaii, Honolulu, Hawaii, Mary Blaine Durant, Honolulu, Hawaii, for Vanterpool.

Lawrence D. Kumabe, Robin K. Campaniano, Deputy Attys. Gen., Honolulu, Hawaii, for defendants.

## DECISION

SAMUEL P. KING, Chief Judge.

### Statement of the Case

. Effective February 8, 1978, Defendant Charles G. Clark as Superintendent of the Department of Education, and Defendant Thomas Yamashita as Director of the Management Audit and Civil Rights Branch of the Department of Education, State of Hawaii, terminated the employment of Plaintiff Ira Vanterpool as a Staff Specialist II (equal educational opportunities coordinator), and of Plaintiff Elizabeth Fujiwara as a Staff Specialist I (equal educational opportunities specialist), both of whom were certified nonprobationary temporary employees in the Management Audit and Civil Rights Branch.

These actions and the incidents leading up to the terminations resulted in the complaint filed in this court on February 24, 1978. A temporary restraining order was denied but a preliminary injunction was granted on March 8, 1978, as a result of which plaintiffs were reinstated in their respective positions but immediately placed on administrative leave.

Plaintiffs claim that they were discharged for exercising rights of free speech guaranteed to them by the First and Fourteenth Amendments and in violation of substantive and procedural rights of due process guaranteed to them by the Fourteenth Amendment.

### Summary of Evidentiary Facts

As to each plaintiff, the formal steps leading to their discharge followed the same pattern. On January 30, 1978, Mr. Yamashita submitted to the Superintendent by letter a Recommendation for Discharge of Mr. Ira Vanterpool (Cplt. Ex. V–7) and a Recommendation for Discharge of Ms. Elizabeth Fujiwara (Cplt. Ex. F–5). Each letter set forth "facts leading to my recommendation for discharge" and cited certain "departmental policies and procedures" that had been violated. The letters also recommended suspension without pay effective January 31, 1978. Mr. Yamashita recited that he was acting in "accordance with Regulation # 5110 of the School Code and Article V, Rights of the Employer of Unit 6 Educational Officers collective bargaining agreement." The letters were "APPROVED FOR SUBMISSION TO SUPERINTENDENT" by Deputy Superintendent Emiko I. Kudo, but this seems to have been pro forma in these instances and Ms. Kudo was not involved in the recommendations made or actions taken.

On the same date, in "accordance with Procedure # 5110.2 of the DOE School Code," Mr. Yamashita transmitted copies of his recommendations to the plaintiffs and advised each plaintiff that "you may submit written comments to the Superintendent on my recommendation by February 3, 1978, 4:30 p. m. and, that you may appeal in accordance with the Educational Officers Agreement." (Cplt. Ex. V–9 as to Vanterpool, Plaintiffs' Ex. F–19 as to Fujiwara)

By letter dated January 31, 1978, Superintendent Clark notified each plaintiff of his receipt of Mr. Yamashita's recommendations and that "I am hereby suspending you from your duties without pay, effective January 31, 1978," pending final disposition of the recommendation for discharge. (Cplt. Ex. V–8 as to Vanterpool, Cplt. Ex. F–6 as to Fujiwara)

Neither plaintiff responded in any way to Mr. Yamashita or to Superintendent Clark. They testified, and a Union official confirmed the fact, that they had immediately upon receipt of these communications, contacted the Union and had been advised not to respond.

Not having heard from plaintiffs or from anyone on their behalf, Superintendent Clark notified them by letters dated February 7, 1978, that "I am hereby discharging you from the Department of Education, effective February 8, 1978." (Cplt. Ex. V–10 as to Vanterpool, Cplt. Ex. F–8 as to Fujiwara)

As stated earlier, the complaint herein was filed on February 24, 1978.

Formal Grievance Form: Step 1 for Educational Officers of Bargaining Unit 6 was filed by the Union on behalf of each plaintiff on February 28, 1978, in "accordance with Article XIV, Grievance Procedure of the Agreement between the Hawaii State Board of Education and Hawaii Government Employees' Association, AFSCME, Local 152, AFL–CIO" protesting both the suspension without pay and the discharge. The grievance complained that each action had been taken "without proper cause" and "without allowing . . . a hearing prior to the decision" and also that each em-ployee's "right to free speech" had been "abridged." (Defendants' Ex. 12 as to Vanterpool and Ex. 11 as to Fujiwara) Plaintiff Fujiwara did not sign the grievance form as to her. By mutual agreement on the same day, the DOE and the Union "agreed to waive all the steps in Article 14—Grievance Procedure of the Educational Officers agreement, and proceed directly to arbitration" in the two cases. (Defendants Ex. 13) On March 3, 1978, Superintendent Clark confirmed to Mr. David Trask, Executive Director of the Union, the selection of Mr. Lincoln J. Ishida (a private practitioner in Honolulu) as arbitrator for these grievances. (Defendants'.Ex. 14) Because of certain communications from Plaintiff Fujiwara (Plaintiffs' Ex. F–23) and her attorney (Plaintiffs' Ex. F–22) setting forth "conditions which I require to be met before the grievance is pursued by the Hawaii Government Employees' Association on my behalf," nothing further has taken place in connection with the arbitration.

### The Public Dispute

Plaintiffs were employed to program and monitor the DOE's compliance with the several applicable federal laws and regulations in the civil rights area, especially Title IX of the Education Amendments of 1972. Plaintiff Vanterpool is an experienced worker in civil rights matters and Plaintiff Fujiwara was the former executive director of the local ACLU affiliate. Plaintiff Vanterpool reported to Mr. Yamashita and Plaintiff Fujiwara reported to Mr. Vanterpool.

One of the programs developed was a Pacific Regional Conference on Civil Rights Compliance in Schools to be held December 27–29, 1977. A news release on the conference dated December 8, 1977, over Plaintiff Vanterpool's name (Plaintiffs' Ex. V–11) resulted in a news story the next day in the Honolulu Star-Bulletin (Plaintiffs' Ex. V–2), which included the following language:

At a news conference yesterday, Vanterpool said many educators have not been aware fully of the various laws and what the impact is for them in working with students.

"The awareness level in the department (of education) and in community groups has been very low," Vanterpool said.

He said the DOE has signed a certificate of assurance that it will comply with the laws and so far has not been found at fault in cases claiming violation of civil rights or equal opportunity.

But Vanterpool said there are 52 cases still pending involving the DOE. He said the delay in completing those cases results from federal and regional officials being backlogged with cases filed throughout the country.

This news story provoked an immediate negative reaction from Superintendent Clark who made his displeasure known to Mr. Yamashita who testified that he cautioned Mr. Vanterpool against holding any official news conferences without first advising Mr. Yamashita (who in turn would advise Superintendent Clark). Mr. Clark testified that his concern was that he be aware of what might appear in the media about the DOE so that he could be prepared for the inevitable inquires that would be directed to him.

A further story on the conference appeared in The Sunday Star-Bulletin & Advertiser on December 25, 1977, this time attributing the information received to Plaintiff Fujiwara (then Yonahara) and including the following language:

Elizabeth Yonahara, DOE equal education specialist, said the conference will show educators how to implement federal civil rights laws, especially Title IX, which deals with sex discrimination in the schools.

Yonahara said the conference is important because the DOE's deadline for civil rights compliance in the area of physical education and athletics is July 1978.

The DOE was supposed to have begun compliance in the areas of counseling, vocational education and sex bias in the classrooms as early as 1975, she said.

But the DOE and other school districts across the country haven't acted in these areas up until now, because they weren't sure how to implement a compliance program and because the federal government had not "pushed compliance until now," she said.

She said the civil rights program has become a greater priority under the Carter administration. She said HEW Secretary Joseph Califano has cut HEW funds to 27 school districts which have not complied with Title IX provisions regarding the elimination of sex discrimination in schools.

This story went relatively unnoticed in the fuss over subsequent developments, but in retrospect Mr. Yamashita and Mr. Clark took exception to Ms. Fujiwara's statement that the DOE had not "acted in these areas up until now" and the implication that federal funds were jeopardized.

To further publicize the upcoming conference Plaintiffs had arranged for the visiting experts who were going to address the conference to be interviewed by news media persons at the Pagoda Hotel on December 26, 1977. What came out of this was more of an interview with Mr. Vanterpool. Messrs. Clark and Yamashita were treated with taped statements by Mr. Vanterpool during the evening television news broadcasts saying that the state could lose $30.5 million in U.S. education funds by failing to comply with equal opportunity laws. This was duly reported in the Honolulu Star-Bulletin on December 27, 1977. (Plaintiffs' Ex. V–3)

Mr. Yamashita testified that he was "dismayed" at this development because he thought it was understood that there would be no news conferences without his prior knowledge. Mr. Clark was furious. He held his own press conference on December 29, 1977, which was duly reported in the Honolulu Star-Bulletin on December 30, 1977, under the headline "Dispute at DOE" and the sub-headline "Clark, 2 Staffers at Odds" (Plaintiffs' Ex. V–4) and in The Honolulu Advertiser under a less abrasive headline (Plaintiffs' Ex. V–6). Both plaintiffs were quoted as having responded to Superintendent Clark's statements to the press, further exacerbating relationships between

themselves and their superiors. The Honolulu Star-Bulletin story best sets out the situation.

State Education Superintendent Charles Clark and two employees of the Department of Education yesterday gave conflicting views of the department's compliance with civil rights legislation.

The superintendent held a news conference to discuss "unreliable releases of information to the press."

The two employees expected to be summoned to meetings with Clark are Ira Vanterpool, coordinator for equal opportunity, and Elizabeth Yonahara, staff specialist for equal education opportunity.

Vanterpool, hired by Clark in February, previously was a researcher and planner in the city Office of Human Resources. Yonahara, hired by Clark in June, is the former executive director of the American Civil Liberties Union of Hawaii.

Clark yesterday said he would be having meetings on the dispute but refused to discuss possible action against the two, saying, "I do not discuss personnel matters with the press."

Late yesterday, Vanterpool said he was notified by telephone that he had a 10 a.m. appointment (today) with the superintendent.

The basic dispute is whether the DOE is in full compliance with civil rights legislation requiring equal opportunities for students, equal employment opportunities and non-discrimination because of race, sex or handicap.

Clark maintains that the DOE is in compliance and has "fulfilled all of the requirements of the federal government to date."

Vanterpool and Yonahara disagree and yesterday repeated their claims that the DOE is not in full compliance because certain deadlines have not been met and certain documents have not been prepared.

Earlier this week Vanterpool had told news reporters that $30.5 million in federal funds could be cut off if the DOE does not fully comply with all provisions of the federal legislation.

Yesterday, Clark said he called his news conference because "I felt there have been unreliable releases of information to the press" and that some of that information does not give a true picture of the DOE and civil rights.

"We do not have any federal funds in jeopardy as of this date. We are in compliance until somebody rules that we are not in compliance," Clark said.

· · · · ·

Asked about possible parent and teacher confusion with conflicting statements on civil rights coming from the superintendent and his staff, Clark said he met yesterday morning with his district superintendents and the procedures for the schools will be clarified through the district offices.

He also noted there are different and conflicting opinions coming from district, federal and state agencies and from court decisions. He said, "I don't think any (school) district in the nation knows whether they're complying or not complying."

But, he maintained, Vanterpool's job as coordinator on civil rights matters "does not include his stating the position of the department and the Board of Education on these matters."

Vanterpool told the Star-Bulletin that the job description given him when he was hired says "I'm supposed to represent the DOE on these matters to boards, commissions and the press."

Vanterpool said he was "appalled" by statements reported from Clark's news conference.

"I don't like my character being defamed, that I'm unreliable," Vanterpool said.

Vanterpool said he has every right to speak about the DOE program, that he has documentation to support his statements and asked, "Are we living in democracy or a dictatorship?"

He said he previously submitted written reports to his superiors saying that the DOE is not in full compliance and yesterday estimated the DOE's compliance at about "47 to 50 percent."

"We are not in full compliance in physical education, athletics or counseling," Vanterpool said.

Yonahara yesterday said the grievance procedures for students and employees now are being drafted and "will be ready in the spring."

"They're overdue. They were due July 1976. We are not in compliance. They're not written. They're being drafted (now)," Yonahara said.

Clark and other DOE staffers yesterday said there are a variety of other grievance procedures in existence and the federal legislation permits the use of those.

The 10:00 a. m. meeting on December 30, 1977, was held as scheduled. (It is to be noted that this meeting took place before the Honolulu Star-Bulletin story just quoted appeared on the streets, so that Superintendent Clark was not at the time aware of the quotes attributed to plaintiffs and commenting on his news conference of December 29, 1977.) At this meeting, Superintendent Clark expressed himself forcefully and firmly that both plaintiffs were to work through Mr. Yamashita and were not to make public statements without prior notification.

The Honolulu Star-Bulletin for December 31, 1977, reported on this meeting (Plaintiffs' Ex. V–5) under the headline "2 DOE officials mum on civil rights issue" as follows:

Two state Department of Education officials, whose comments on DOE compliance with civil rights laws irritated school Superintendent Charles Clark, yesterday were civil, but not saying much.

Ira Vanterpool, DOE equal education opportunities coordinator, and Elizabeth Yonahara, specialist in that area, were summoned to a meeting in Clark's office yesterday morning.

On Thursday, Clark made it clear he was unhappy with statements by Vanterpool and Yonahara. They had told reporters that the DOE was not in full compliance with federal laws barring discrimination—and that the DOE could lose federal funds as a result.

Clark disagreed. He said the DOE was complying fully.

Clark also told reporters Thursday that Vanterpool was not authorized to speak for the Department of Education on civil rights matters.

After the meeting yesterday with Clark, Vanterpool said, "We had a discussion. There's been so much flak that I've decided I'm not going to discuss these points anymore."

But asked how he could not discuss civil rights since that was his field, Vanterpool replied, "That's a good point. At this point, I don't want to make any comments until I see what develops.

"I still stand by my statements."

Yonahara said at the meeting she and Vanterpool "just reiterated our stands."

She declined to comment further, saying, "I'd really rather not escalate it (the controversy)."

The record is not entirely clear to me as to what happened between the meeting with Superintendent Clark on December 30, 1977, and Mr. Yamashita's letters of January 30, 1978, recommending discharge. Plaintiff Fujiwara was on vacation from December 31, 1977, to January 17, 1978, and again on January 26–27, 1978. Plaintiff Vanterpool was busy with Title IX workshops throughout the State from November 1977 to January 1978, specifically from January 23–26, 1978, on the Island of Hawaii. Mr. Yamashita testified that he had occasion to caution Mr. Vanterpool "again" regarding some discussion Mr. Vanterpool instituted at this latter workshop regarding a modification of a remedial action form. Immediately following this last workshop, Mr. Vanterpool went to the mainland, returning on or about January 29, 1978.

### The Basis for Discharge

Mr. Yamashita's letter of January 30, 1978, recommending Mr. Vanterpool's discharge (Plaintiffs' Ex. V–7; Appendix A) sets out in 7 paragraphs the "facts leading to my recommendation for discharge." These are characterized as "unauthorized and irresponsible statements" (although paragraph 1 relates to an irregularity in handling an honorarium) which "violated . . . departmental policies and procedures." There follow another 3 paragraphs introduced by the statement: "In addition, by his past actions, Mr. Vanterpool has repeatedly ignored my instructions."

The Superintendent's letter of discharge of February 7, 1978 (Plaintiffs' Ex. V–10) simply tracks Mr. Yamashita's letter, setting forth the same "facts" and conclusions.

Mr. Yamashita's letter of January 30, 1978, recommending Ms. Fujiwara's discharge (Plaintiffs' Ex. F–5; Appendix B) sets out in 8 paragraphs "facts leading to my recommendation for discharge." Again these are characterized as "unauthorized and irresponsible statements" (although paragraph 7 alleges improper use of xeroxing facilities and paragraph 8 alleges a failure to keep him advised of a proposed discussion with students) which "violated . . departmental policies and procedures."

The Superintendent's letter of discharge of February 7, 1978 (Plaintiffs' Ex. F–8) simply tracks Mr. Yamashita's letter, setting forth the same facts and conclusions.

### The Law

*Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), teaches us that "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." The Supreme Court reiterated that it had already "indicated, in more general terms, that statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." The basis for the decision is stated to be the "public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment . . . ."

The Court tested the statement in question by asking whether it could be the subject of an action for damages if made by a member of the general public and when judged by the standard laid down in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The Court agreed that "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

As so often happens with leading cases from the Supreme Court, the footnotes cannot be ignored. Footnote 3 reads:

> It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.

*Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) reaffirmed even a nontenured teacher's right to reinstatement "if the decision not to rehire him was made by reason of his

exercise of constitutionally protected First Amendment freedoms." But the Court went on to say that a "borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct" but that he "ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."

The Court concluded that initially "the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct."

Between these two Supreme Court cases, *Donahue v. Staunton,* 471 F.2d 475 (7th Cir. 1972), applied the rationale of *Pickering* to order an offer of reinstatement to a Catholic chaplain at a state hospital. The *Donahue* majority enumerated the "[i]nterests of the State which, if strong enough, the Court in *Pickering* felt might lead to a different result in the future" as:

(1) maintaining discipline or harmony among co-workers;

(2) need for confidentiality;

(3) employee's position may be such that his false accusations may be hard to counter because of the employee's presumed greater access to the real facts;

(4) statements which impede the employee's proper performance of his daily duties;

(5) statements so without foundation as to call into question his competency to perform his job; and

(6) a close and personal working relationship between the employee and supervisor which called for personal loyalty and confidence.

Further Analysis and Findings of Facts

It is obvious, and I find, that the statements made by Plaintiff Vanterpool to the news media as detailed above played a substantial part in the recommendation to discharge him. None of the other matters mentioned in the letter about him as violations of policies and procedures or as demonstrating insubordination had been brought to his attention in a disciplinary context until the letter of January 30, 1978.

Similarly, it is obvious, and I find, that the statements made by Plaintiff Fujiwara to the news media as detailed above played a substantial part in the recommendation to discharge her. None of the other matters mentioned in the letter about her as violations of policies or procedures had been brought to her attention in a disciplinary context until the letter of January 30, 1978.

The record does not support a finding that either position is so sensitive or so important as to require a stricter standard for the release of information or for the expression of opinion than the usual government job.

Much evidence was introduced as to the truth or falsity of the statements in question. On the record before me, I find that neither plaintiff made any false statement recklessly or knowingly. Some of their data is suspect and some their conclusions simplistic, but newspaper headlines made more of Mr. Vanterpool's rather mild answers to reporters' questions, and Department officials made more of the headlines by overreacting than if they had just waited for the next week's headlines.

Much evidence was introduced as to other reasons for discharging Mr. Vanterpool or Ms. Fujiwara. The difficulty with some of the matters presented is that no mention of such reasons was made either in Mr. Yamashita's recommendations for discharge or in Mr. Clark's letters of discharge. As to those non-Free Speech matters that were

mentioned, it is not at all clear that either plaintiff would have been discharged but for their public statements concerning DOE compliance with civil rights legislation.

Another difficulty in this area is that neither plaintiff was given a reasonable opportunity to meet and refute, if possible, these further charges, yet in the course of their testimony, each had plausible rebuttals to these charges. Both were notified that their discharge was being effected in accordance with Regulation # 5110 of the School Code and Article V, Rights of the Employer of the Unit 6 Educational Officers collective bargaining agreement.

But Regulation # 5110 (Plaintiffs' Ex. F–10), and especially Procedure # 5110.4, applies only to excluded (from the collective bargaining agreement) educational officers, and if it did apply to either plaintiff, provides for the right to make a written request to the Superintendent for a hearing within 10 days after receipt of a letter of intent to demote or dismiss (plaintiffs were given 3 days and discharged in 7 days effective 8 days after receipt of Mr. Yamashita's letters recommending discharge and of Mr. Clark's letters for immediate suspension).

And if Article 5 of the Agreement (Plaintiffs' Ex. F–9) applies, so does Article 14. Article 5 relates to "Rights of the Employer" and Article 14 relates to "Grievance Procedure." As mentioned earlier, all steps up to arbitration have been waived (at least by the Union and the Department) and an arbitrator has been named.

In either event, plaintiffs are entitled to further administrative procedures before it can be said that they, or either of them, would have been discharged but for their public statements.

The argument is made that plaintiffs cannot pursue their 1983 action until they have gone through the grievance procedures of the collective bargaining agreement. Exhaustion of administrative remedies has never been a prerequisite to an action under 42 U.S.C. § 1983 to protect constitutional rights.

The argument is made that neither plaintiff has any constitutionally protected right because each is a temporary employee. The technicalities of classification of public employees make the situation rather complex, but it is my understanding that each plaintiff is a certificated, limited term appointment—temporary position, educational officer in the DOE. The duration of appointment, as set out in the Department's Administrative Guidelines (Defendants' Ex. 5) is given as:

Continuous for the duration of funding provided for the position subject to the occurrence of another appointment, resignation, retirement, termination for cause or layoff.

Whatever this means, there is enough status to keep plaintiffs in court.

### Conclusion

Plaintiff Vanterpool was discharged from public employment in substantial part because of his exercise of his right to speak on issues of public importance in violation of the protection accorded him by the First Amendment. Defendants have failed to show by a preponderance of the evidence that the same decision would have been reached as to his discharge in the absence of the protected conduct.

Plaintiff Fujiwara was discharged from public employment in substantial part because of her exercise of her right to speak on issues of public importance in violation of the protection accorded her by the First Amendment. Defendants have failed to show by a preponderance of the evidence that the same decision would have been reached as to her discharge in the absence of the protected conduct.

Each plaintiff is entitled to an injunction permanently enjoining defendants and their successors and agents from demoting or dismissing either plaintiff from his or her present position by reason of or arising out of any of the statements attributed to either of them in the letters recommending discharge written by Mr. Yamashita and the letters discharging them written by Mr. Clark.

## Caveats

■ Nothing set out in this decision is intended to imply that the appropriate officials of the DOE cannot demote or discharge either plaintiff for actions or omissions, past or future, not accorded First Amendment protection. It is assumed that any such action, if taken, would follow applicable departmental policies and procedures and collective bargaining agreements.

Nothing set out in this decision is intended to imply that the appropriate officials of the DOE cannot define or redefine the duties and responsibilities of the positions now held by either plaintiff so as to bring either of them within the category of positions contemplated in *Pickering* and *Dona-hue* where the interests of the state might justify stricter control over an employee's public statements.

Finally, nothing set out in the decision is intended to imply that either plaintiff has any greater right to continued employment than he or she would have had without regard to (what I have held to be) the abortive attempt to discharge them under Superintendent Clark's letters of February 7, 1978.

## Order

The parties shall submit proposed forms of injunctions consistent with this decision.

Matters relating to damages, attorneys' fees, and costs are reserved for further determination.

## Appendix A

GEORGE R. ARIYOSHI
GOVERNOR

CHARLES G. CLARK
SUPERINTENDENT

### STATE OF HAWAII
### DEPARTMENT OF EDUCATION
P. O. BOX 2360
HONOLULU, HAWAII 96804

OFFICE OF THE SUPERINTENDENT

January 30, 1978                                     CONFIDENTIAL

MEMORANDUM

To:      Mr. Charles G. Clark, Superintendent
         (s) Thomas S. Yamashita
From:    Thomas S. Yamashita, Director
         Management Audit and Civil Rights Branch
         Office of the Superintendent
Subject: Recommendation for Discharge of Mr. Ira Vanterpool

---

In accordance with Regulation # 5110 of the School Code and Article V, Rights of the Employer of Unit 6 Educational Officers collective bargaining agreement, I am recommending that Mr. Ira Vanterpool, Staff Specialist II, of the Management Audit and Civil Rights Branch be discharged. Pending your final disposition of my recommendation for discharge. I am recommending that Mr. Vanterpool be suspended without pay, effective January 31, 1978, as pro- vided for in School Code Regulation # 5110.

The facts leading to my recommendation for discharge are as follows:

1. In August, 1977, Mr. Vanterpool submitted to you an annual report on the DOE's affirmative action program without first gaining my approval. He was specifically instructed by you to have all materials concerning the

department receive my prior approval. However, in October, 1977, Mr. William Waters, then the Deputy Superintendent, had to re-emphasize your directive to Mr. Vanterpool. Even with these specific instructions, Mr. Vanterpool proceeded to schedule speakers and promised an individual an honorarium for the Pacific Regional Civil Rights Conference in December, 1977, without securing approval from me. He exceeded the departmental regulations governing payments to individuals receiving honorariums and consequently received another warning from me for exceeding beyond his authority. On January 3, 1978, he again did not obtain my approval when he hired an employee without following established departmental procedures.

EXHIBIT V–7

2. On or about December 7, 1977, Mr. Vanterpool scheduled a news media conference concerning a civil rights conference again without advising me or the Superintendent that he would be discussing matters of statewide concern to the Department of Education. This action was clearly contrary to and beyond the scope of Mr. Vanterpool's authority as a Staff Specialist II. Mr. Vanterpool was warned by me that any future conference with the news media was to be scheduled only after advising me first.

3. Nevertheless, on or about December 26, 1977, Mr. Vanterpool called another news media conference at the Pagoda Restaurant and failed to advise me in defiance of my instructions. He proceeded to discuss issues on which he was never authorized to speak. He indicated that the DOE could lose $30.5 million in federal funds if equal educational opportunity laws were not complied with by July 1978. This threat of loss of funding grossly exaggerated the actual situation.

4. By this action, Mr. Vanterpool forced the Superintendent to call a news media conference on or about December 29, 1977 to correct the misconceptions created by Mr. Vanterpool's statements. The Superintendent had to specifically point out that the DOE, to date, has complied with all federal requirements and that no federal funds were in jeopardy.

5. However, Mr. Vanterpool still persisted in making further statements on or about December 29, 1977 to the news media, maintaining that the DOE was not in full compliance with Title IX requirements. He then stated that he had documentation to support his position, that these documents had been submitted to his superiors, and that the DOE's compliance was about 47 to 50 percent.

6. Upon my inquiry, Mr. Vanterpool stated that the documentation he referred to was the result of the Title IX self-evaluation that the DOE is undergoing. However, the result that he referred to concerned just one phase of the self-evaluation process, involving only the procedural steps rather than the substantive compliance criteria of Title IX.

7. On or about December 30, 1977, Mr. Vanterpool met with you, and you had to personally advise him that he had no authority to make statements representing the DOE, nor to bypass and ignore his immediate superior. Nevertheless, following this conference, he continued to advise the news media of the veracity of his previous statements.

By these unauthorized and irresponsible statements, Mr. Vanterpool has violated the following departmental policies and procedures:

1. Section 1110.1 of the Policies and Regulations of the School Code requires that the Superintendent or designee alone issues news releases on

departmental policies of statewide concern. Furthermore, there is nothing in the position description of position number 79882 to authorize him to conduct news media conferences on such a critical issue involving the DOE without seeking any prior approval.

2. "Guidelines for Open Communications within the DOE and with the Public" set forth certain common sense rules concerning the release of information to the media:

"Keep all persons who share in responsibility for your work informed about what is happening. Alert them to potential problems.

"Where there may be disagreements on policy or personality differences, make every effort to resolve them internally before they become subjects of public controversy. Cultivate a sensitivity to matters that might become public issues, and have the courtesy to warn others who may be involved.

"To avoid duplication and confusion, coordinate news releases and public statements within the information channels of the department. This means provide an informational copy of the release—from school to district to Superintendent's office, from branch to assistant superintendent to Superintendent's office, and vice versa. The Superintendent's office should be notified BEFORE release of any news or public statements bearing on statewide policies, decisions or activities. When the subject is a critical one, telephone."

3. Administrative Directive #2, "Guidelines for Press Relations and Release of Information for Public Consumption," requires, consistent with the guidelines above, that disagreements on policy should be resolved internally before they become subjects of public controversy, disruptive of the orderly and cohesive functioning of the Department.

4. Department Procedures Budget No. 77–1 "Special Contracts and Agreements for Personal Services" does not authorize a Staff Specialist II to commit funds for honorariums without gaining approval by his superior, nor does it allow payment of an honorarium of more than $100 per day.

In addition, by his past actions, Mr. Vanterpool has repeatedly ignored my instructions:

1. In August, 1977, Mr. Vanterpool was requested to revise the statistical summaries of the Title IX Self-Evaluation Checklist to clearly indicate that the data referred to procedural steps completed rather than levels of compliance, as his draft summaries indicated. In spite of my request, he persisted in distributing the same statistical summaries which erroneously showed levels of compliance with Title IX when in fact the substantive compliance questions were yet to be answered. In addition, as I pointed out above, he continued to erroneously refer to these data to indicate to the news media that the DOE was not in compliance with Title IX.

2. In November, 1977, a draft document on Title IX guidelines was returned to him by me with instructions to see me because it was unacceptable. Inasmuch as guidelines are needed to ensure expeditious implementation of Title IX, he was expected to review the document with me. To this date, he has not done so.

3. On or about November, 1977, he was assigned by me to prepare a report on the advantages and disadvantages of the DOE submitting a project application under the Women's Educational Equity Act (P.L. 93–380). A project application, if approved, could have resulted in the DOE receiving up to $15,000 for a small grant or up to $175,000 for a general grant to enhance educational opportunities for

women. This report was due on November 18, 1977. By mid-December, Mr. Vanterpool had still failed to submit his report in spite of my numerous requests. As a consequence, the project application was prepared by someone else to meet the January 12, 1978 application deadline.

On Tuesday, January 31, 1978, Mr. Vanterpool will be advised of my recommendation for discharge, his right to submit written comments to you, and his right to appeal my recommendation for discharge in accordance with the Educational Officers Agreement.

Your immediate attention to my recommendation for Mr. Vanterpool's suspension without pay pending his discharge would be appreciated.

APPROVED FOR SUBMISSION TO SUPERINTENDENT:

/s/Emiko I. Kudo
Emiko I. Kudo, Deputy Superintendent

Date: January 30, 1978

Appendix B

GEORGE R. ARIYOSHI
GOVERNOR

CHARLES G. CLARK
SUPERINTENDENT

STATE OF HAWAII
DEPARTMENT OF EDUCATION
P. O. BOX 2360
HONOLULU, HAWAII 96804

OFFICE OF THE SUPERINTENDENT

January 30, 1978                                CONFIDENTIAL

MEMORANDUM

To:       Mr. Charles G. Clark, Superintendent
                (s) Thomas S. Yamashita

From:    Thomas S. Yamashita, Director
            Management Audit and Civil Rights Branch
            Office of the Superintendent

Subject: Recommendation for Discharge of Ms. Elizabeth Fujiwara

In accordance with Regulation # 5110 of the School Code and Article V, Rights of the Employer of Unit 6 Educational Officers collective bargaining agreement, I am recommending that Mrs. Elizabeth Fujiwara, Staff Specialist I, of the Management Audit and Civil Rights Branch, be discharged. Pending your final disposition of my recommendation for discharge, I am further recommending that Ms. Fujiwara be suspended without pay, effective January 31, 1978, as provided for in School Code Regulation # 5110.

The facts leading to my recommendation for discharge are as follows:

1. On or about December 8, 1977, Ms. Fujiwara, together with her immediate superior Mr. Ira Vanterpool, scheduled a press conference without advising me or the Superintendent that matters of statewide concern to the Department of Education would be the topic of discussion. This action was clearly contrary to and beyond the scope of her authority and that of Mr. Vanterpool, as staff specialists in the Department of Education.

2. Again, on or about December 24, 1977, Mrs. Fujiwara made public statements to the media without first obtaining my approval. She spoke on matters of Department-wide concern without consulting with the Superin-

tendent. Mrs. Fujiwara first suggested that the DOE was not in compliance with Title IX, and that the DOE was supposed to have compliance in certain areas such as counseling, vocational education, and sex bias.

3. On or about December 26, 1977, Ms. Fujiwara and Mr. Vanterpool scheduled another news media conference at the Pagoda Restaurant and again failed to advise me or the Superintendent in blatant defiance of my instructions. At this conference, the press was advised that the DOE could lose $30.5 million in federal funding if equal educational opportunity laws were not complied with by July, 1978. This threat of loss of funding *grossly exaggerated* the actual situation.

4. By this action, Ms. Fujiwara and Mr. Vanterpool forced the Superintendent to call a news media conference on or about December 29, 1977 to correct the misconceptions created by these statements. The Superintendent had to specifically point out that the DOE, to date, has complied with all federal requirements and that no federal funds were in jeopardy.

5. However, Ms. Fujiwara and Mr. Vanterpool still persisted in making further statements on or about December 29, 1977 to the news media. Ms. Fujiwara was quoted as saying that the DOE was not in full compliance with Title IX requirements, that certain documents had not been prepared and that she disagreed with the Superintendent's statements that the DOE was in compliance with Title IX requirements. Ms. Fujiwara repeatedly contradicted the Superintendent's statement to the news media.

6. On or about December 30, 1977, Ms. Fujiwara met with the Superintendent, and the Superintendent had to personally advise her that she had no authority to make statements representing the DOE, nor to bypass and ignore her superiors. At this meeting, she defied the Superintendent's authority to speak for the DOE by repeatedly disagreeing with the Superintendent's statements to the news media. Nevertheless, after Ms. Fujiwara's meeting with the Superintendent, she continued to advise the news media that she had reiterated her disagreement with the Superintendent.

7. On or about December 7, 1977, Mrs. Fujiwara was making copies of a 94-page document regarding the law of future interests which was totally unrelated to her work. She was explicitly warned that she could not use public equipment and funds for her own private needs. Nevertheless, she continued to use DOE funds to copy materials from the law library. I asked her immediate supervisor, Mr. Ira Vanterpool, on January 13, 1978, that I wanted Mrs. Fujiwara to make available for my inspection those copies xeroxed at the law library. To date, Mr. [sic] Fujiwara has not complied with my request.

8. At the meeting on December 30, 1977 with you, both Mrs. Fujiwara and Mr. Vanterpool assured you that they would keep me apprised of their weekly activities, particularly on matters of statewide concern. In spite of these assurances, both of them failed to provide this advice. In fact, on January 4, 1978, I had to schedule a meeting with a representative from OIS to discuss Mrs. Fujiwara's and Mr. Vanterpool's participation as speakers on student grievance procedure, a critical matter of statewide significance, at the forthcoming statewide student conference. Mrs. Fujiwara and Mr. Vanterpool did not advise me as to their desire to participate in the conference or to cancel their participation. I was compelled to issue strict instructions that any discussion with students would be premature at this time since State plans to review existing grievance procedures and the formulation of

new procedures had not as yet been finalized.

By these unauthorized and irresponsible statements, Ms. Fujiwara has violated the following departmental policies and procedures:

1. Section 1110.1 of the Policies and Regulations of the School Code requires that the Superintendent or designee alone issues news releases on departmental policies of statewide concern. Furthermore, there is nothing in the position description of position number 79883 to authorize Ms. Fujiwara to conduct news media conferences on such a critical issue involving the DOE without seeking any prior and appropriate approval.

2. "Guidelines for Open Communications within the DOE and with the Public" set forth certain common sense rules concerning the release of information to the media:

"Keep all persons who share in responsibility for your work informed about what is happening. Alert them to potential problems.

"Where there may be disagreements on policy or personality differences, make every effort to resolve them internally before they become subjects of public controversy. Cultivate a sensitivity to matters that might become public issues, and have the courtesy to warn others who may be involved.

"To avoid duplication and confusion, coordinate news releases and public statements within the information channels of the department. This means provide an informational copy of the release—from school to district to Superintendent's office, from branch to assistant superintendent to Superintendent's office, and vice versa. The Superintendent's office should be notified BEFORE release of any news or public statements bearing on statewide policies, decisions or activities. When the subject is a critical one, telephone."

3. Administrative Directive # 2 on "Guidelines for Press Relations and Release of Information for Public Consumption" requires, consistent with the guidelines above, that disagreements on policy should be resolved internally before they become subject of public controversy, disruptive of the orderly and cohesive functioning of the Department.

4. BOE Policy # 5511, Employee Code of Ethics, states, "No employee or official will accept compensation in any form other than that to which he/she is entitled from the State government when performing his/her duties within the scope of the activities for which he/she is responsible." In addition, State Ethics Commission memorandum, dated April 5, 1977, entitled "Use of State Time, Equipment, and Facilities" (distributed to DOE personnel on or about April 6, 1977) states that all State employees cannot use State facilities, equipment, for private business purposes.

On Tuesday, January 31, 1978, Ms. Fujiwara will be advised of my recommendation for discharge, her right to submit written comments to you, and her right to appeal my recommendation for discharge in accordance with the Educational Officers Agreement.

Your immediate attention to my recommendation for Ms. Fujiwara's suspension without pay pending her discharge would be appreciated.

APPROVED FOR SUBMISSION TO SUPERINTENDENT:

/s/Emiko I. Kudo
Emiko I. Kudo, Deputy Superintendent

Date: January 30, 1978